**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------

H.M. and M.M., on behalf of J.M. and A.M.,

                          Plaintiffs

            - against -

New York City Department of Education,

                        Defendant.

-----------------------------------------------------------------

             **AMENDED COMPLAINT**

             **08 CV 01230 (WHP) (MHD)**

      Plaintiffs, H.M. and M.M., on behalf of J.M. and A.M., by their attorneys, Mayerson & Associates, as and for their Complaint against defendant, the New York City Department of Education ("NYCDOE"), allege and states the following:

      1.  Plaintiffs J.M. and A.M., children of plaintiffs H.M. and M.M., are minor children who have been diagnosed with an autism spectrum disorder.  J.M. and A.M. were at all relevant times a student residing within the New York City School District entitled to all rights, entitlements, and procedural safeguards mandated by applicable law and statutes including, but not limited to the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400, *et. seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education Law and Part 200 of the Commissioner's Regulations.

      2.  Plaintiffs H.M. and M.M. are the parents of J.M. and A.M.  Plaintiffs are residents of the State of New York, residing at all relevant times at an address within the New York City school district.

3.   J.M. and A.M. and their parents H.M. and M.M. are not expressly identified herein by their given names or addresses because of the privacy guarantees provided in the IDEIA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. § 1232(g) and 34 C.F.R. § 99.

4.   Defendant New York City Department of Education ("NYCDOE"), upon information and belief, is a duly constituted school district organized under the laws of the State of New York, and is the agency charged with the obligations to provide J.M. and A.M. with a free and appropriate public education ("FAPE"), *see infra*, ¶ 8.

## THE RELIEF BEING SOUGHT

5.   This action is brought pursuant to the provisions of 20 U.S.C. § 1400, *et. seq.*, more commonly known as the IDEIA and, in particular, 20 U.S.C. §§ 1415(i)(2) and (3).  *See also*, 34 C.F.R. §§ 300.516 and 300.517.

6.   This action is being brought to secure statutory attorneys' fees that plaintiffs are entitled to recover pursuant to the fee-shifting provisions of the federal IDEIA statute, 20 U.S.C. §§ 1415(i)(3)(A)-(G).  H.M. and M.M., on behalf of J.M., should be awarded attorneys' fees as the substantially prevailing party in due process hearings for the 2005-2006, and 2006-2007 school years, and on behalf of A.M. for the 2006-2007 school year, under New York City Impartial Hearing Office Case Numbers 104006, 107976, and 107227, respectively.

## JURISDICTION AND VENUE

7.   This Court, pursuant to 20 U.S.C. §§ 1415(i)(2) and (3), 34 C.F.R. §§ 300.516 and 300.517, 28 U.S.C. §§ 1331 and 1367, has jurisdiction of this action without regard to the amount in controversy.  Venue is proper in that plaintiffs and defendant both reside in or are situated in this District.

8.   Pursuant to the IDEIA statute, as well as the New York State Education Law, all school agencies within the State are required to offer eligible students with disabilities special education programs and services that are tailored to meet the individual needs of each child with a disability.  The FAPE required under IDEIA will be different for each child, as IDEIA does not accept a "one size fits all" approach.

### FACTUAL BACKGROUND FOR J.M.'S 2005-2006 SCHOOL YEAR

9.   On or about September 8, 2005, H.M. and M.M., through their attorneys, Mayerson & Associates, filed for an impartial hearing at the administrative level in an effort to secure reimbursement and other relief relating to the 2005-2006 school year for the cost and expenses of J.M.'s special education program and services.  J.M.'s parents filed for due process due to the NYCDOE's failure to recommend and provide an appropriate placement and program individualized to meet J.M.'s unique needs.

10. This case was withdrawn, without prejudice, because J.M.'s parents thought the case was being settled.  The NYCDOE never made a settlement offer and J.M.'s parents re-filed their request on or about February 10, 2006.

11. The evidentiary hearing on this matter took place on March 23 and April 10, 2006. Christina D. Thivierge, Esq., of Mayerson & Associates represented the plaintiffs.   The NYCDOE conceded Prong I of the Burlington/Carter test.  However, the NYCDOE challenged the appropriateness of J.M.'s program and did not concede Prongs II or III.  Plaintiffs bore the burden of proof in regards to the appropriateness of the services provided to J.M.

12. The impartial hearing officer heard testimony from J.M.'s witnesses regarding the appropriateness of J.M.'s placement and extended day services secured by J.M.'s parents.

Plaintiffs entered into evidence 25 documents in support of their case.  The NYCDOE did not offer any testimonial or documentary evidence regarding the claims raised by J.M.'s parents.

13. By "Findings of Fact and Decision" dated May 28, 2006, Impartial Hearing Officer Mindy G. Wolman, Esq., rendered an award in favor of plaintiffs, establishing plaintiffs as the substantially prevailing party in the 2005-2006 administrative due process proceeding.[1] Defendant never appealed from this underlying administrative decision, which thus became final and non-appealable on or about July 3, 2006.

### FACTUAL BACKGROUND FOR J.M.'S 2006-2007 SCHOOL YEAR

14. On or about September 11, 2006, H.M. and M.M., through their attorneys, Mayerson & Associates, filed for an impartial hearing at the administrative level in an effort to secure reimbursement and other relief relating to the 2006-2007 school year for the cost and expenses of J.M.'s special education program and services.  J.M.'s parents filed for due process due to the NYCDOE's failure to recommend and provide an appropriate placement and program individualized to meet J.M.'s unique needs.

15. This case (Case No. 106513) was withdrawn, without prejudice, because J.M.'s parents thought the case was being settled.  The NYCDOE never made a settlement offer and J.M.'s parents re-filed their request on or about November 3, 2006.

16. The evidentiary hearings on this matter took place on May 8, June 22 and September 7, 2007.  Christina D. Thivierge, Esq., of Mayerson & Associates represented the plaintiffs.  The NYCDOE challenged all three prongs of the Burlington/Carter test for relief.  Pursuant to the United States Supreme Court's decision in Schaffer v. Weast, 546 U.S. 49 (2005), plaintiffs

---

[1] A copy of the decision has been annexed hereto as Exhibit A.  Please note that all exhibits have been redacted to protect the particular identity of each family member.  See ¶ 3.

assumed and bore the burden of persuasion on all three prongs of the <u>Burlington</u>/<u>Carter</u> test for relief.  Plaintiffs' met that heavy burden.

17. The impartial hearing officer heard testimony from eleven witnesses presented by plaintiffs.  The plaintiffs entered into evidence 30 documents in support of their case.  The NYCDOE offered no testimony or documentary evidence challenging the claims raised by J.M.'s parents.

18. By "Findings of Fact and Decision" dated October 25, 2007, amended November 7, 2007, and corrected November 26, 2007, Impartial Hearing Officer Susan K. Markus, Esq., rendered an award in favor of plaintiffs, establishing plaintiffs as the substantially prevailing party in the 2006-2007 administrative due process proceeding.[2]  Defendant never appealed from this administrative decision, which thus became final and non-appealable on or about January 2, 2008.

### FACTUAL BACKGROUND FOR A.M.'S 2006-2007 SCHOOL YEAR

19. On or about October 3, 2006, H.M. and M.M., through their attorneys, Mayerson & Associates, filed for an impartial hearing at the administrative level in an effort to secure reimbursement and other relief relating to the 2006-2007 school year for the cost and expenses of A.M.'s special education program and services.  A.M.'s parents filed for due process due to the NYCDOE's failure to recommend and provide an appropriate placement and program individualized to meet A.M.'s unique needs.

20. The evidentiary hearing on this matter took place on November 13, 2006, and January 16, March 19, May 2, June 18, and July 23, 2007.  Christina D. Thivierge, Esq., of Mayerson & Associates represented the plaintiffs.  The NYCDOE maintained that they offered A.M. a FAPE and challenged all three prongs of the <u>Burlington</u>/<u>Carter</u> test for relief.  Pursuant to the United

---

[2] A redacted copy of the November 26, 2007 decision has been annexed hereto as Exhibit B.

States Supreme Court's decision in <u>Schaffer v. Weast</u>, 546 U.S. 49 (2005), plaintiffs assumed and bore the burden of persuasion on all three prongs of the <u>Burlington</u>/<u>Carter</u> test for relief. Plaintiffs' met that heavy burden.

21. The impartial hearing officer heard testimony from fifteen witnesses presented by plaintiffs.  The plaintiffs entered into evidence 21 documents in support of their claims in this case.  The NYCDOE offered no testimonial evidence and relied largely on evidentiary evidence and cross-examination of A.M.'s witnesses to challenge the claims raised by A.M.'s parents.

22. By "Findings of Fact and Decision" dated October 26, 2007, Impartial Hearing Officer Gary D. Peters, Esq., rendered an award in favor of plaintiffs, establishing plaintiffs as the substantially prevailing party in the 2006-2007 administrative due process proceeding.[3] Defendant never appealed from this administrative decision, which thus became final and non-appealable on or about December 1, 2007.

## CONCLUSION

23. The defendant is liable to pay plaintiffs their reasonable attorneys' fees arising out of J.M. and A.M.'s IDEIA administrative due process proceedings.  The fees requested herein are entirely reasonable and appropriate because:

(a) upon information and belief, plaintiffs' attorneys' office is the only firm in the country whose practice is devoted almost exclusively to representing children and adolescents with autism spectrum disorders, like J.M. and A.M., in educational rights disputes;

(b) the principal of plaintiffs' attorneys' firm has testified before the United States Congress on the subject of the educational rights of children diagnosed with autism spectrum disorders;

---

[3] A redacted copy of the decision has been annexed hereto as Exhibit C.

(c) plaintiffs' attorneys have published and presented on the subject of the educational rights of children diagnosed with autism spectrum disorders;

(d) plaintiffs' attorneys have special knowledge and expertise concerning the educational needs of children diagnosed with autism spectrum disorders;

(e) plaintiffs' attorneys' office has represented children with autism spectrum disorders in numerous states across the nation, and has even consulted to families outside of the United States; and

(f)  to the extent that there is a "prevailing rate" in the Southern District of New York for sophisticated autism intervention cases, plaintiffs' attorneys' prevailing rates are reasonable and within the applicable standard.

24. Necessary duties involved with preparing J.M. and A.M.'s cases for administrative due process hearings for the 2005-2006 and 2006-2007 school years included, but were not limited to: (a) corresponding with plaintiff and J.M. and A.M.'s teachers and service providers; (b) holding numerous telephone conferences; (c) writing and filing impartial due process hearing requests; (d) reviewing and disclosing documentary evidence relevant to J.M. and A.M.'s claims; (e) scheduling and preparing witnesses to testify at the hearings; (f) drafting and preparing post-hearing submissions; and (g) developing effective case presentations for the 2005-2006 and 2006-2007 school years.

25. For all of the above efforts, plaintiffs should be awarded attorneys' fees, related costs and disbursements for the three administrative proceedings in an amount to be set by this Court.

### PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, this Court should (a) fix and award plaintiffs their statutory attorneys' fees and related costs and disbursements from the IDEIA due process

proceedings for three administrative proceedings in an amount to be set by the Court, (b) award

plaintiffs the attorneys' fees and related costs and disbursements associated with this action in an

amount to be set by the Court, and (c) award plaintiffs such other, different and further relief as

this Court deems proper.

Dated: February 29, 2008             ***s/ Gary S. Mayerson/Christina D. Thivierge***
        New York, New York               Gary S. Mayerson (GSM 8413)
                                     Christina D. Thivierge (CT 9565)
                                     Mayerson & Associates
                                     330 West 38th Street, Suite 600
                                     New York, New York 10018
                                     (212) 265-7200
                                     (212) 265-1735 (facsimile)
                                     christina@mayerslaw.com
                                     nury@mayerslaw.com

# FINDINGS OF FACT AND DECISION

| | |
|---|---|
| Case No. | 104006 |
| SED ID No. | 19081 |
| Student's Name: | J███ M██ |
| Date of Birth: | October 24, 2000 |
| District: | 10 |
| Hearing Requested by: | Parents |
| Dates of Hearings: | March 23, 2006<br>April 10, 2006 |
| Hearing Officer: | Mindy G. Wolman, Esq. |
| Record Close Date: | May 22, 2006 |

Findings of Fact and Decision                                                    1
Case No. 104006

## NAMES AND TITLES OF PERSONS WHO APPEARED ON MARCH 23, 2006

| | | |
|---|---|---|
| M███M███ | Mother | |
| Christina D. Thivierge, Esq. | Attorney | Parents |
| Howard Sharp | District Representative | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED ON APRIL 10, 2006

| | | |
|---|---|---|
| M███M███ | Mother | |
| Christina D. Thivierge, Esq. | Attorney | Parents |
| Howard Sharp | District Representative | Department of Education |
| Jacqueline Hickey (By Telephone) | Associate Director, McCarton School | Parents |
| Jennifer Strazzeri (By Telephone) | Home to School Coordinator, McCarton School | Parents |
| Eva Szulyovskszky (By Telephone) | Head Teacher, McCarton School | Parents |
| Leslie Weinberg (By Telephone) | Occupational Therapist | Parents |
| Lavinia Pereira (By Telephone) | Speech & Language Pathologist | Parents |
| Laura Heil (By Telephone) | Occupational Therapist | Parents |
| Jill Murphy Cochrane (Telephone) | Speech & Language Therapist | Parents |

## DOCUMENTS ENTERED INTO THE RECORD MARCH 23, 2006

| Exh. No. | Description | Party |
|---|---|---|
| IHO-1 | Decision on Request for Extension of Compliance Date, 3/2/06, 1 p. | Hearing Officer |
| A. | Amended Demand for a Hearing, 3/15/06, 8 pp. | Parents |
| B. | IEP, 6/22/ 05, 14 pp. | Parents |
| C. | IEP, 10/5/04, 14 pp. | Parents |
| D. | Individual Education Plan (McCarton School), 9/05-8/06, 12 pp. | Parents |
| E. | Occupational Therapy Progress Report, 3/6/06, 3 pp. | Parents |
| F. | Speech and Language Progress Report, 3/4/06, 3 pp. | Parents |

Findings of Fact and Decision                                                                2
Case No. 104006

Exh.
No.      Description                                                                    Party

G.       Occupational Therapy Progress Report, 3/1/06, 3 pp.                            Parents
H.       Progress Report -- Home Therapy Program, 2/23/06, 3 pp.                        Parents
I.       Speech and Language Progress Report, 1/13/06, 3 pp.                            Parents
J.       Educational Progress Report, 1/13/06, 4 pp.                                    Parents
K.       Occupational Therapy Progress Report, 1/10/06, 4 pp.                           Parents
L.       Letter from M███ M███ to Mary Callahan, 8/1/05, 1 p.                           Parents
M.       Letter from M███ M███ to Mary Callahan, 6/13/05, 1 p.                          Parents
N.       ABA Programming & Progress Report, 4/12/05, 4 pp.                              Parents
O.       Speech & Language Progress Report, 4/10/05, 3 pp.                              Parents
P.       Letter from M███ M███ to Mary Callahan, 4/6/05, 1 p.                           Parents
Q.       Letter from M███ M███ to Elliot Seitzman, 4/4/05, 1 p.                         Parents
R.       Speech & Language Re-Evaluation, 3/24/05, 6 pp.                                Parents
S.       Occupational Therapy Evaluation Summary, 3/15/05, 4 pp.                        Parents
T.       Occupational Therapy Evaluation, 2/15/05, 5 pp.                                Parents
U.       Letter from M███ M███ to Sileni Nazario, with attached letter                 Parents
         to Elliott Seitzman 1/18/05, 2 pp.
V.       Hearing Officer Judith Schneider's Decision, 12/6/04, 10 pp.                   Parents
W.       Enrollment Contract, 6/22/05, 2 pp.                                            Parents
X.       Attendance Records, 2005-2006, 1 p.                                            Parents
Y.       Invoices and Cancelled checks, 2005-2006, 49 pp.                               Parents

## DOCUMENTS ENTERED INTO THE RECORD APRIL 10, 2006

Exh.
No.      Description                                                                    Party

IHO-2    Interim Order on Pendency, 3/23/06, 4 pp.                                      Hearing Officer

## DOCUMENTS ENTERED INTO THE RECORD POST-HEARING (MAY 26, 2006)

Exh.
No.      Description                                                                    Party

IHO-3    Amended Interim Order on Pendency, 4/18/06, 5 pp.                              Hearing Officer
IHO-4    Email from Hearing Officer, 4/18/06, 1 p.                                      Hearing Officer
IHO-5    Email from Hearing Officer, 5/9/06, 2 pp.                                      Hearing Officer
IHO-6    Email from Hearing Officer, 5/9/06, 1 p.                                       Hearing Officer
IHO-7    Decision on Request for Extension of Time, 3/23/06, 1 p.                       Hearing Officer

Findings of Fact and Decision                                                                                    3
Case No. 104006

      On February 10, 2006, the parents of ▮▮▮▮ M., by their attorneys Mayerson and Associates, filed a request for an impartial hearing under the Individuals with Disabilities Education Act, 20 U.S.C. section 1415(f)(1) and Article 89 of the New York State Education Law. I was appointed as hearing officer on February 10, 2006, and the matter came on for hearings on March 23, 2006 and April 10, 2006.  The compliance date for issuing a decision was extended twice at the request of the parents and once at the request of the school district (Exhs. IHO-1, IHO-5, IHO-6, IHO-7, Tr. 3/23/06 at 45-46). Lists of the persons who appeared at the hearings and the documentary evidence submitted are appended to this Order.[1]

      The parents requested a written order on pendency directing that the student's pendency placement is the placement described in Hearing Officer Judith Schneider's December 6, 2004 decision in a prior impartial hearing proceeding (NYC Case Number 55946, NYS Case Number 10322; a copy of which was included in the Record as Exh. V). Hearing Officer Schneider's decision was not appealed.   The Department of Education conceded the issue of pendency. After the initial pendency order was issued (Exh. IH0-2), the parents requested that the order be amended to reflect that pendency relate back to September 8, 2005. The District conceded that September 8, 2005 was the appropriate date for pendency purposes. An amended pendency order was issued and emailed to the parties on April 18, 2006 (Exhs. IHO-3 and IHO-4).

## BACKGROUND AND POSITIONS OF THE PARTIES

      ▮▮▮▮ is five years old and is classified as a student with a disability under the autism disability classification. His classification is not in dispute. The Department of Education conceded that it did not offer ▮▮▮▮ an appropriate program and placement for the 2005-2006 school year (Tr. 3/23/6 at 21). The parents are seeking an order directing the Department of Education to reimburse them for the cost of ▮▮▮▮ 's tuition at the McCarton School for the 2005-2006 school year, together with reimbursement for the cost of extended day ABA (Applied

---

[1] The preparation of the within decision was delayed and complicated by difficulties in obtaining complete and accurate transcripts of the hearings held in this proceeding. The hearings were tape-recorded, and even though the tapes for the April 10 hearing were reviewed and corrections made to the transcript by the transcription company, both transcripts still contain multiple errors and several instances in which words and phrases are listed as "unintelligible."

Behavioral Analysis) services, occupational therapy and speech and language therapy for the
2005-2006 school year. The parents contend that the Department of Education failed to offer
█████ an appropriate program and placement for the present school year, that the program and
placement at the McCarton School, as supplemented by the extended day ABA therapy,
occupational therapy and speech and language therapy, are meeting █████ s special education
needs, and that equitable factors support their claim for reimbursement.

       Although the Department of Education conceded that it has not offered █████ an
appropriate program and placement for the 2005-2006 school year, it took the position that the
program and placement chosen by the parents was not appropriate, and that equitable factors did
not support their claim for tuition reimbursement.

                           **THE DEPARTMENT OF EDUCATION'S CASE**

       The Department of Education did not offer any testimony or documentary evidence.

                                    **THE PARENTS' CASE**

       The testimony offered on behalf of the parents included the testimony of the student's
mother, as well as the testimony of staff from the McCarton School and several of █████ s
service providers. The witnesses included Jacqueline Hickey (McCarton School, Associate
Director), Jennifer Strazzeri (McCarton School, Home-to-School Coordinator), Eva
Szulyovskszky (McCarton School, Head Teacher), Leslie Weinberg (Occupational Therapist),
Lavinia Pereira (Speech and Language Pathologist), Laura Heil (Occupational Therapist) and Jill
Murphy Cochrane (Speech and Language Therapist). The parents' documentary evidence
included the following: correspondence; Department of Education Individualized Education
Programs ("IEPs"); the McCarton School Individual Education Plan with progress notations;
progress reports; evaluations; an Impartial Hearing Officer's decision from a previous IDEA
hearing; the McCarton School enrollment contract, attendance records, invoices, cancelled
checks, and charge card statements reflecting payment to the McCarton School; an affidavit,
invoices and cancelled checks regarding speech and language therapy provided by Lavinia
Pereira; and affidavits and cancelled checks for ABA therapy provided by Kim Santomassimo
and Castia Sierra.

The testimony and documentary evidence will be discussed more fully below.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A board of education may be required to pay for educational services obtained for a child by the child's parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parent's claim. [Florence County School District Four v. Carter, 510 U.S. 7 (1993), School Committee of Burlington v Department of Education of Massachusetts, 471 U.S. 359 (1985)]. The party seeking to challenge an IEP under the IDEA, which in this case is the student's parents, bears the burden of persuasion. [Shaffer v. Weast, 126 S.Ct. 528 at 537 (2005); Cabouli v. Chappaqua Central School District, 2005 WL 3500287 (SDNY, 2005)].

The Department of Education "conceded prong one" at the hearing, thereby acknowledging that it did not offer the student an appropriate program and placement. The parents have therefore met the first of the three criteria for tuition reimbursement under the Burlington/Carter analysis. Issues pertaining to the Department of Education's proposed program and placement need not be addressed herein.

The Parents also have the burden of establishing the appropriateness of the placement and program that they have chosen for their child. (Application of a Child with a Disability, Appeal No. 95-57; Application of the Bd. of Educ., Appeal No. 02-093). In order to meet that burden, they must show that the private school offered an educational program which met the student's special education needs (Burlington, 471 U.S. at 370; Application of a Child with a Disability, Appeal No. 94-29). The private school need not employ certified special education teachers, nor have its own IEP for the student (Application of a Child with a Disability, Appeal Nos. 94-20; 02-093).

█████ has been diagnosed with an autism spectrum disorder, and has substantial deficits in the expressive and receptive language, motor skills, motor planning, and in the social and self-stimulatory domains. █████ is non-verbal, and experiences substantial regression in his acquired skills even with brief (e.g., one week) gaps in services. His special education needs are well-documented in the Record.

Findings of Fact and Decision                                              6
Case No. 104006

The testimony and documentary evidence offered at the hearing demonstrated that the placement and program chosen by ████s parents has been meeting his special education needs. The McCarton School program and the extended day services are providing ████with an individualized, consistent, and comprehensive program that is addressing all areas of his deficits. This is amply demonstrated in the testimony of ████s mother, ████s service providers, and the McCarton School staff. The program developed by the McCarton School (Exh. D) addresses all of ████s deficit areas, and the evaluation and progress reports show that his needs are being met, he continues to progress, and he continues to need the intensive program that he is presently receiving (See Exhs. E, F, G, H, I, J, K, N, O, R, S, and T).

The McCarton School provides ████with ABA services, speech and language therapy and occupational therapy. ████ along with the other students at the school, receives continuous one-to-one instruction. Rather than utilizing a pull-out model for speech and language therapy, speech therapists work in the classrooms together with the behavior therapists. Parents are able to observe their children and the instructional program at any time from an observation room at the school. The program also includes a home-to-school coordinator who goes to students' homes for two hours per week to assist in parent training, in facilitating the generalization of skills to the home environment and to coordinate with the therapists providing ABA therapy in the home. The school developed an educational program for ████(Exh. D), and he has been making progress in meeting and working toward the goals set forth in that program. The goals set forth in the McCarton School Individual Education Plan address the following: expressive and receptive language, pre-academic skills, social and leisure skills, activities of daily living, behavior skills, and occupational therapy issues. His program also includes a "sensory diet" in small doses throughout the day. This reportedly helps him attend and reduces his frustration level. (Tr. 4/10/06 at 56-70)

████has been making progress toward his educational goals. He has been acquiring some signing skills for communication, he is now able to match pictures to objects, his self-stimulatory behaviors have dramatically decreased, his perseverative behaviors have decreased, his ability to attend and interact appropriately has increased, his imitation skills have increased,

and his fine motor skills are improving. In addition, he has been successfully toilet trained on a schedule. His social skills are also improving. Although he does not spontaneously interact with other children, he is now becoming more observant regarding his peers at school and has been engaging in parallel play. The routine at the school is very helpful for him. He continues to need to work on attentional issues, the reduction of self-stimulatory behaviors, increasing appropriate play, expressive and receptive language, and adaptive behaviors. (Tr. 4/10/06 at 71-78)

▮s home-based ABA program is a necessary component of his educational program. ▮has difficulty with the generalization of skills, which is the ability to use an acquired skill in a variety of environments as opposed to just in the environment in which the skills are learned (Tr. 4/10/06 at 96). Without the home-based ABA program, which is coordinated with and designed to complement his instruction at the McCarton School, he would not have been able to generalize the skills obtained at school to home environment. These skills include critical issues such as activities of daily living, toileting, communication, and the ability to refrain from self-stimulatory and other maladaptive/inappropriate behaviors. Moreover, in the absence of additional structured learning at home, ▮s tendency to engage in inappropriate behaviors would result in his reinforcing or acquiring inappropriate behaviors that would have to be "unlearned" at school. He would not be making the progress that he is making without the home-based ABA program. The additional ABA is necessary to ensure continuity between home and school. Without continuity and consistency in instruction, ▮experiences regression very quickly. The testimony of all of the witnesses at the hearing underscored the necessity of ▮s home-based ABA program.

The extended day speech and language therapy and occupational therapy also provide ▮with necessary instruction and address his need to be able to generalize skills to the non-school environment. Parent training is also a necessary component to ▮s educational program and his ability to generalize acquired skills to the home and community environments. Parent training enables ▮s parents to provide him with the structure, consistency and continuity that he needs for the generalization of skills. The McCarton School facilitates parent training through the observation room at the school and the services of the home-to-school

Findings of Fact and Decision                                                                                    8
Case No. 104006

coordinator. The home-based ABA therapy also facilitates parent training. (Tr. 4/10/06 at 78-79).

Jaqueline Hickey, the McCarton School Associate Director, opined that ▓▓▓'s optimal program would be comprised of structured one-to-one learning "from the moment that he wakes up to the moment he goes to bed." She said that he needs to continue in his current placement at the McCarton School, with the additional homebased ABA therapy, occupational therapy and speech and language therapy. This program, she opined, is necessary for ▓▓▓ to continue to receive educational benefits and to avoid regression and the loss of skills. (Tr. 78-89)

Lavinia Pereira, ▓▓▓'s speech and language pathologist, reports that he presents with severe speech and language delay secondary to developmental delays, oral motor planning difficulties and oral weakness. He communicates needs by using a combination of sounds, gestures, signs and facial expressions. In her sessions with ▓▓▓ Ms. Pereira is utilizing oral/motor stimulation planning activities and PROMPT ("Prompts for Restructuring Oral Muscular Phonetic Targets") therapy. He is encouraged to use signs while verbally approximating his requests. ▓▓▓ has made progress. ▓▓▓'s extended day speech and language services are necessary to appropriately addresses ▓▓▓'s expressive/receptive language deficits, to assist him in developing articulation/oral motor planning skills and to provide him with an adequate amount of PROMPT therapy. (See Exh. F).

▓▓▓ is "severely apraxic," with severe oral motor planning deficits. He has been making progress and within the month prior to the hearing had begun to say some of the target words that Ms. Pereira has been working on with him. His oral motor function has also begun to improve. He has made progress in jaw strength and in his ability to move his jaw and control his tongue. This progress is critical in working toward his ability to produce speech. Ms. Pereira opined that ▓▓▓ continues to need speech and language therapy on a consistent and regular basis, during the school day and after-school, as he experiences regression in acquired skills over holidays and breaks. The regression in skills is noticed in terms of his ability to sit still and attend during his speech and language sessions, increased self-stimulatory behaviors and excessive crying. It can take several weeks to get him back on track after a one week break in services. (Tr. 4/10/06 at 149-164)

Findings of Fact and Decision                                                                9
Case No. 104006

██████'s occupational therapy needs pertain to sensory processing skills, motor planning skills, trunk control, body awareness, and balance. He has low muscle tone throughout his trunk and upper extremities, and wears bilateral braces on his feet. ██████ has tactile sensitivity issues and needs to improve fine motor and perceptual skills. He also needs to consistently receive proprioreceptive and vestibular input throughout the school day and at home. This reportedly improves his self-regulation skills, which in turn improves his ability to maintain and acquire new skills. He has been making steady progress in his occupational therapy sessions. (Exh. G)

Based on the foregoing, I find that the McCarton School program and after-school ABA therapy, occupational therapy and speech and language therapy are meeting ██████'s special education needs. ██████'s parents have therefore met the second of the three criteria for tuition reimbursement under the Burlington/Carter analysis.

The remaining issue is whether equitable factors support the parent's claim for tuition reimbursement. The Department of Education took the position that equitable factors did not support their claim, but there is nothing in the Record to support that position. To the contrary, it appears that the parents cooperated with the CSE. ██████'s mother participated at the CSE meetings and in the CSE evaluation process (Exhs. B, C, P, and U). She also provided the CSE with copies of evaluations and progress reports (Exh. M, Q), and she followed up with the CSE when she didn't receive the CSE's IEP and placement recommendations (Exh. L).

There is nothing in the Record to suggest that the fees charged by the McCarton School and by ██████'s extended day service providers are excessive or unreasonable, particularly in light of the highly individualized one-to-one instruction and therapy that ██████ is receiving. I therefore find that equitable factors support the parents' claim for tuition reimbursement. ██████'s parents have therefore met the third of the three criteria for tuition reimbursement under the Burlington/Carter analysis.

For all the foregoing reasons, I find that ██████'s parents are entitled to reimbursement for the costs of the McCarton School tuition and services, home-based ABA therapy, and extended day occupational therapy and speech and language therapy for the 2005-2006 school year (which runs from September 1, 2005 through August 31, 2006).

The evidence submitted at the hearing reflects that the annual tuition at the McCarton School is $84,000.00 (Exh. W), the cost of the home-based ABA therapy is $25.00 per hour (Exh. Y), and the cost of speech and language therapy from ████'s after-school speech-language pathologist is $115.00 per 45-minute session (Exh. Y). In addition, as reflected on separate monthly invoices issued by Cecelia M. McCarton MD PC, the parents have incurred and continue to incur costs for one session per week of additional language therapy at the rate of $80.00 per session, one session per week for the treatment of swallowing dysfunction and/or oral function for feeding at the rate of $75.00 per session, and three sessions per week of occupational therapy at the rate of $155.00 per session (Exh. Y).

## ORDER

It is hereby ordered that:

1.      The Department of Education is directed to reimburse the parents for the cost of tuition for ████'s enrollment at the McCarton School for the 2005-2006 school year, in an amount not to exceed $84,000.00.

2.      The Department of Education is directed to reimburse the parents for the costs of speech and language therapy and occupational therapy as reflected on the monthly invoices from Cecelia M McCarton MD PC for the period September 1, 2005 through August 31, 2006 as follows: (a) one session per week of language therapy, at a rate not to exceed $80.00 per session; (b) one session per week of treatment for swallowing dysfunction and/or oral function for feeding, at a rate not to exceed $75.00 per session; and (c) three sessions per week of occupational therapy, at a rate not to exceed $155.00 per session.

3.      The Department of Education is directed to reimburse the parents for the cost of fifteen (15) hours per week of home-based ABA therapy from September 1, 2005 through August 31, 2006, at rate not to exceed $25.00 per hour.

4.      The Department of Education is directed to reimburse the parents for the cost of three (3) forty-five minute sessions per week of after-school speech and language therapy provided by a speech-language pathologist from September 1, 2005 through August 31, 2006, at a rate not to exceed $115.00 per 45-minute session.

Findings of Fact and Decision                                                    11
Case No. 104006

5.      To the extent that invoices and proof of payment were made part of the documents entered into evidence in this proceeding as Exhibit Y, payment shall be made no later than July 3, 2006.[2]

6.      For the remainder of the parents' expenditures for tuition and services for the 2005-2006 school year as described herein, payment shall be made within thirty (30) days of the submission of invoices and proof of payment for such tuition and services.

Dated: May 28, 2006

MINDY G. WOLMAN, ESQ.
Impartial Hearing Officer

**PLEASE TAKE NOTICE**

**Within 35 days of the date of this decision, the parent and/or the Board of Education of the City of New York has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.**

**"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.**

**Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.**

---

[2] The documentary evidence that was accepted into Evidence at the March 23 and April 10 hearings, including Exhibit Y, was submitted, by the Hearing Officer, to the Department of Education's Impartial Hearing Office on April 10, 2006. Since these invoices, affidavits, and proofs of payment are already within the Department of Education's possession, it should not be necessary for the parents to resubmit them in order to seek implementation of the within Order directing reimbursement.

## AMENDED FINDINGS OF FACT AND DECISION

Case Number:            107967

Student's Name:         J███M███

Date of Birth:          October 24, 2000

District:               2

Hearing Requested By:   Parent

Date of Hearing:        November 21, 2006
                        May 8, 2007
                        June 22, 2007
                        September 7, 2007

Hearing Officer:        Susan K. Markus, Esq.

**CORRECTED**

Hearing Officer's Amended Findings of Fact and Decision                                    1

Case No.  107967

## NAMES AND TITLES OF PERSONS WHO APPEARED NOVEMBER 21, 2006

| | | |
|---|---|---|
| Christina D. Thivierge | Attorney, Mayerson & Associates | Parent |
| Karen Sutherland | Chairperson Designee, CSE, Region 9 | Department of Education |

## AMES AND TITLES OF PERSONS WHO APPEARED MAY 8, 2007

| | | |
|---|---|---|
| Christina D. Thivierge | Attorney, Mayerson & Associates | Parent |
| Karen Sutherland | Chairperson Designee, CSE, Region 9 | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED JUNE 22, 2007

| | | |
|---|---|---|
| Christina D. Thivierge | Attorney, Mayerson & Associates | Parent |
| M█ M█ | | Parent |
| Nancy Patilano | Classroom Teacher | Parent |
| Josie Velazquez (Via Telephone) | Paraprofessional | Parent |
| Susan Cruz Via Telephone) | Assistant Principal | Parent |
| Dewey Alem (Via Telephone) | Psychologist | Parent |
| Lois Siegler (Via Telephone) | District Representative | Parent |
| Elissa Rotolo (Via Telephone) | Speech/Language Pathologist, McCarten School | Parent |
| Karen Sutherland | Chairperson Designee, CSE, Region 9 | Department of Education |

Hearing Officer's Amended Findings of Fact and Decision                    2

Case No.  107967

_____

<u>NAMES AND TITLES OF PERSONS WHO APPEARED SEPTEMBER 7, 2007</u>

| | | |
|---|---|---|
| Christina D. Thivierge | Attorney, Mayerson & Associates | Parent |
| M██ M████ | Parent | |
| Jackie Hickey | Assistant Director, McCarton School | Parent |
| Sara Kahan | Independent Expert | Parent |
| Jennifer Clark | Home ABA Supervisor | Parent |
| Erica Konopka (Via Telephone | Occupational Therapist | Parent |
| Karen Sutherland | Chairperson Designee, CSE, Region 9 | Department of Education |

Hearing Officer's Amended Findings of Fact and Decision                                    3

Case No. 107967

---

## INTRODUCTION

On September 11, 2006 the parents of this student with a disability, by their attorneys, Mayerson and Associates by Christina Thivierge, requested an impartial hearing under the Individual with Disabilities Education Act, 20 U.S.C. section 1415(f)(1) and Article 89 of the New York State Education Law. I was appointed as impartial hearing officer on November 3, 2006, and the matter came on for hearings on May 8, 2006, June 22, 2006 and September 7, 2006. The hearings were conducted at the Impartial Hearings Office of the New York City Department of Education. The District was represented by Karen Sutherland, District Representative for the Department of Education ("the Department"). The Parents were represented by Christina Thivierge, Esq. A list of witnesses and documents received into evidence is attached to this decision.

The parents request for hearing included a request for a pendency order. A pendency hearing was conducted at the Impartial Hearings Office of the New York City Department of Education on November 21, 2006 at which the Department agreed to pendency placement as outlined in Hearing Officer Mindy Wolman's decision dated May 28, 2006 on a previous hearing proceeding. (NYC Case # 104006, Parent Exh. B) An interim pendency order was issued on November 21, 2006.

The September 11, 2006 hearing request alleged that the Department of Education failed to offer the student a free and appropriate education (FAPE) for the 2006-2007 school year, that the private program selected by the parents was appropriate and requested reimbursement for the cost of the program.

## BACKGROUND

The student is a six year old boy who is diagnosed with an autism spectrum disorder. His classification is not in dispute. An IEP Meeting for this student was held on June 2, 2006. The resulting IEP recommended a 6:1:1 special class. (Parent Ex. C) On July 27, 2006 Parents received a Final Notice of Recommendation from the Department offering the student placement in a 6:1:1 classroom at P.S. 94/61. On August 10, 2006 the student's mother visited the offered placement. On August 14, 2006

the student's mother sent a letter to the department advising that the offered placement was inappropriate, and notifying the Department that she would be unilaterally placing her son in an appropriate program, and that she would seek to hold the Department financially responsible.

Parents asserted that the placement offered by the Department did not constitute a free and appropriate education for this student, that the educational program provided by The McCarton School is appropriate, and that equitable factors support the parents' claim. Parents seek an order directing the department to reimburse them for the cost of the student's tuition at the McCarton School for the 2006 – 2007 academic year, including the cost of the extended day and home-based Applied Behavior Analysis ("ABA") therapy, occupational therapy and speech and language therapy.

The Department asserted that the program offered to this student for the 2006 – 2007 academic year was appropriate and that the program selected by the parent is not appropriate.

THE DEPARTMENT OF EDUCATION'S CASE

The District offered no testimony or documentary evidence other than the evidence adduced through its cross-examination of the Parents' witnesses.

THE PARENT'S CASE

Parents offered the testimony of the student's mother, the staff of the McCarton School and several of the student's related service providers as well as the testimony of Department personnel involved in the creation of the student's IEP for 2006 – 2007 and the teacher and paraprofessional from the classroom placement offered by the Department. The witnesses included Nancy Patilano (classroom teacher, PS 94/61), Josie Velazquez (paraprofessional), Susan Cruz (Assistant Principal, PS 94/61), Dr. Dewey Alem (Department psychologist), Lois Siegler (District Representative), Elissa Rotolo, (speech pathologist, McCarton School), Jackie hickey (Assistant Director, McCarton School), Sarah Kahn (independent evaluator ), Jennifer Clark (Home ABA Supervisor) and Erica Konopka (occupational therapist). The Parents documentary evidence included IEPs from the Department as well as from the McCarton School, Notices of

Hearing Officer's Amended Findings of Fact and Decision                              5

Case No. 107967

---

Recommendations, an Impartial Hearing Officer decision from a previous IDEA hearing for this student, dated May 28, 2006, progress reports from the students related service providers, a behavioral progress report, a behavioral intervention plan, a educational progress reports, neurological evaluations, resumes of providers, attendance records and various correspondence between the Parent and the Department.  In addition, Parent submitted invoices and cancelled checks regarding payments to the McCarton school and service providers.

The testimony and documentary evidence will be discussed more fully below, and a list of witnesses and evidence is attached to this decision.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

One of the main purposes of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400 - 1487) is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; Schaffer, 126 S. Ct. at 531).  A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a comprehensive written IEP (20 U.S.C. § 1401[8]; 34 C.F.R. § 300.13; see 20 U.S.C. § 1414[d]).  As the United States Supreme Court held in Schaffer v. Weast the "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." (Schaffer, 126 S.Ct. 528, 537 [2005]).  Accordingly, Parents, as the party seeking relief, have the burden of persuasion to demonstrate that respondent failed to offer the student a free and appropriate education (FAPE).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parents' claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]).

Hearing Officer's Amended Findings of Fact and Decision                                   6

Case No. 107967

The first step is to determine whether the district offered to provide a FAPE to the student (see Mrs. C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]). A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]). The student's recommended program must also be provided in the least restrictive environment (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. § 300.550[b]; 8 NYCRR 200.6[a][1]).

Here, the evidence establishes by preponderance that the Department of Education failed to offer this student a FAPE. The 6/2/06 IEP was procedurally and substantively flawed, and the resulting placement was inappropriate for this student.

Department of Education psychologist, Dewey Alem, who participated in the 6/2/06 IEP conference, could not recall what reports or evaluations regarding this student he had seen prior to the IEP conference, or when he had seen and/or read them. He assumed he had received and read progress reports because the student's school was very conscientious about providing progress reports, but could not state whether or what evaluations were considered as the assembled team created the IEP. (Tr. at 116 – 118) Moreover, Dr. Alem had not observed or evaluated the student prior to participating in the IEP meeting, and the Department did not conduct an evaluation of the student for the purpose of preparing his IEP. (Tr. at 130) By all accounts, significant portions of the 6/2/06 IEP were filled out in advance of the IEP conference, including present performance sections and the annual goals and short term objectives. Neither Dr. Alem nor Ms. Siegler, who also attended the IEP conference, could testify with certainty as to what documents or evaluations provided the basis for their pre-conference articulation of the student's current performance and the formulation of goals and objectives. In fact, they could not state with certainty who actually wrote the substance of those sections on the IEP, where the information came from or when that was done, other than it was before the meeting of the IEP team.

Jackie Hickey, the assistant director of the McCarton School who participated in the 6/2/06 IEP conference, testified that there was no discussion of the student's performance, goals or placement possibilities at the IEP meeting beyond Ms. Siegel's request that Ms. Hickey describe the student's progress at McCarton over the past year. (Tr. at 246 – 248)  Neither Dr. Alem's nor Ms. Sigler's testimony contradicted Ms. Hickey's description of the meeting.

Several of the goals listed on the IEP are grossly inappropriate given the student's current levels of performance.    The unchallenged testimony from Elissa Rotolo, the student's speech and language therapist, was that this six-year-old's receptive and expressive language skills are at the level of a fourteen month old infant and his mastery of sounds is limited to "hmmm" and "wah". (Tr. at 180; Ex. I)  Nonetheless, the IEP lists as a short-term objective that the student will "remain on the same topic when conversing with a peer or an adult for a minimum of 4 exchanges...", an obviously inappropriate goal for a student who is essentially non-verbal.  Additional  goals, including that the student will "spontaneously produce the names of recognizable objects", "provide verbal descriptions, functions and definitions of objects", "will improve his ability to describe remote events to unfamiliar listeners" and "will ask questions for clarification" are similarly inappropriate for this student.  (Ex. C, at 6F)

The IEP fails to address the student's behaviors, and declines to develop a behavior intervention plan (Ex. C at 4), an essential feature for an appropriate educational program for this student according to the unchallenged evaluations, reports and testimony of the student's teachers and providers.    Despite reports from the school providers that the student has a number of interfering behaviors, which were detailed in the provider reports and in the testimony of Ms. Hickey, there was no consideration of a behavior intervention plan at the IEP meeting.  According to Ms. Hickey, without a behavior plan the student's behaviors would increase, greatly compromising acquisition of even basic readiness and communication skills. (Tr. at 248)

The IEP fails to recommend services beyond the school day, despite the strong recommendations of the student's teachers and providers that such services are essential

Hearing Officer's Amended Findings of Fact and Decision                                    8

Case No. 107967

to the student's progress. Ms. Hickey testified that then student "absolutely requires an additional home program" in order to address his maladaptive and self-stimulatory behaviors. (Tr. at 257) Without a home based ABA program, the student would not only fail to acquire new skills, but would likely fail to retain already acquired skills. (Tr. at 258) Moreover, all of the reports from the student's teachers and providers stressed the necessity of extended programming, and of ABA therapy across environments for this student, yet, according to the testimony of the witnesses who attended the IEP meeting, there was no discussion of ABA services. (Tr. at 127, Tr. at 246)

The IEP increased the related services recommendation to five sessions of occupational therapy and seven sessions of speech and language therapy per a week, to be provided 1:1 in a separate location. This recommendation would result in the student being "pulled out" of the classroom for six hours per week. At the hearing, Dr. Alem acknowledged that such a high level of pull out sessions "may interfere with his learning." (Tr. at 123) Nonetheless, there was no discussion of providing the needed related services in either a "push in" model or outside of the school day.

Lastly, I note additional procedural flaws in the IEP development. The Department failed to gather the requisite team members for this IEP meeting. There was no parent member or waiver thereof, no special education teacher from the Department and no general education teacher. Nor does the IEP provide for individualized parent training as required.

It is axiomatic that when the development of the IEP is procedurally and substantively flawed, as it was here, that the resulting placement offered is inappropriate. Independently of, and in addition to, the IEP defects in the creation of the IEP described above, I find that the placement at PS 91/64 as described by the witnesses from the school and classroom is not an appropriate program for this student. A 6:1:1 class generally, and this classroom in particular, is inappropriate for this student given the severity of his needs. As described above, this student is essentially non-verbal. His maladaptive and self-stimulating behaviors seriously interfere with his attention and activity and, according to all reports and testimony, require one on one intervention, which is

unavailable in the 6:1:1 setting.  In addition, Ms. Patilano, the teacher in the classroom to which this student was assigned, testified that the grade levels of the students in her classroom range from kindergarten to first grade, that some were receiving ABA therapy and some were not, and that all of her students had behavior intervention plans.  She could not state how a student would be evaluated for receipt of ABA services, nor could she identify or describe the ABA curriculum that she follows in the classroom, if any. (Tr. at 50 -58)  There is no possibility of provisions of services in the home in this setting (Tr. at 75-76) and all related services provisions are pull out, meaning that this student would have been pulled out of the classroom for 12 sessions per week.  According to Ms. Patilano, no other student in her class was receiving that high a level of related services. (Tr. at 73)  Ms. Patilano did not offer an opinion as to whether her classroom could meet the educational needs of this student since she has never seen his IEP or any other documentation regarding his needs and abilities.  (Tr. at 56)

On this record, I find that the program and placement offered by the Department was not appropriate.

The next consideration in a request in a request for tuition reimbursement is whether the placement selected by the parent was appropriate.  The parent bears the burden of proving the appropriateness of the program selected.  (Application of a Child with a Disability, No.95-57; Application of a Child with a Disability, No. 94-29; Application of the Board of Educ., No. 93-34).  The parent must show that the private school offered an educational program which met their child's special education needs. (Burlington, 471 U.S. at 370; Application of a Child with a Disability, No. 94-29).  The private school need not be approved by the state educational agency to provide instruction to children with disabilities (Florence County School District Four et al. v. Carter by Carter, 510 U.S. 7 (1993)), nor must it employ certified special education teachers, or have its own IEP for the student (Application of a Child with a Disability, No. 94-20).

Parents unilaterally enrolled their daughter at the McCarton School, a private school that provides special education to students who are diagnosed with an Autism Spectrum Disorder.   The evidence at the hearing, in the form of testimony and progress

reports and evaluations from the student's teachers and providers at the McCarton School, establish that the McCarton School's program, including the home based services, provides an effective program that addresses the student's profound needs, and under which the student is making steady, discernible progress. (Exhs. D, G, H, I, J, K, L, N, Q, S and T)

Jaqueline Hickey, Associate Educational Director of the McCarton School, testified that the McCarton School employs an integrated model, integrating ABA, speech and language and occupational therapy. There are 23 students, all diagnosed on the autism spectrum, and the student to teacher ratio is one-to-one. (Tr. at 212 - 213) Students, including this student, receive ABA daily, plus one hour of individual speech and language therapy, and 45 minutes of individual occupational therapy. The therapists are integrated into the classroom, and are part of the classroom team, allowing for individual attention and instruction on a moment to moment basis. (Tr. at 214) Using the Assessment of Basic Language and learning Skills (ABLLS), the school develops an individualized program of instruction which is memorialized in the School's IEP for the student. (Tr. at 216-218, 221) Teachers collect and maintain data on each student's activity and progress and the data is analyzed and reviewed by Ms. Hickey and Dr. McCarton on a daily basis. (Tr. at 228) From a baseline assessment conducted over several days, the School staff develops a behavioral plan for each child that addresses the child's interfering behaviors. The plan is monitored and reevaluated on a daily basis based on the data and therapists report. (Tr. at 226)

This student is in a classroom with three other boys, whose ages range from 6 to 8 years old. There is one speech and language therapist, one occupational therapist and four ABA therapists in the classroom. (Tr. at 219)

Ms. Hickey described the student as highly distractible with several interfering behaviors, such as object twirling, non-contextual hand movements, toe walking, pacing, teeth grinding, head swaying and visual attraction. Without direct instruction and redirection the behaviors are constant. The student has severe expressive language delays. He has in the past relied primarily on signs, and had difficulty attending to the

Hearing Officer's Amended Findings of Fact and Decision                           11

Case No. 107967

---

photos of the Picture Exchange Communication System due to scanning and discrimination deficits. (Tr. at 219 – 222)

Despite these severer deficits, the student has demonstrated significant progress at the McCarton School. In the areas of visual discrimination, vocal output, receptive language skills, and daily living skills, including toileting and dressing, the student has improved and increased his scope of abilities. The incidence and severity of his interfering self-stimulating behaviors has decreased, and he has been able to generalize his progress across the various environments of the school as well as outside the school. (Tr. at 223 – 237) In addition, the student's attention and social skills have improved. (Tr. at 242) The team that services the student, including the classroom therapists and the home-to-school supervisor, meet regularly with Ms. Hickey and Dr. Feldman to review the date, evaluate the student's program and make adjustments as necessary.

The student's program includes a home-based program of ABA therapy. Ms. Hickey testified that the home-based providers are trained by the in ABA and must have at least two years of prior ABA experience. (Tr. at 263) Jennifer Clark, who supervises this student's home program and coordinates the home program with the school, provides two hours per week of supervision and coordinates the 15 - 20 hours of ABA therapy that the student receives in the home. Like the school program, the home program collects, reviews and analyzes the student's data on a daily basis, and Ms. Clark and home ABA providers uses the date to design and adjust the instructional program. In addition, the home team works closely with the student's parents to train them and help them to implement the program into their home, particularly around the student's daily living skills and independence. While noting the severity of this student's deficits, Ms. Clark articulated and detailed the areas of progress that she has observed in the time she has been working with the student. (Tr. at 290 – 308, Ex. G) She noted that the student is "not capable of occupying himself in any kind of an appropriate way when he is left to his own devices", and therefore it is essential to have a trained therapist working with him in all of his environments and contexts. (Tr. at 315)

Hearing Officer's Amended Findings of Fact and Decision                    12

Case No. 107967

---

The student's program includes extended day services of speech and language and occupational therapy. The reports of the providers make clear, the student's extended day speech and language therapy and occupation al therapy are necessary components of his program in order to reinforce the mastery and generalization of his developing skills. Moreover, the reports and testimony of his providers substantiated that he is, in fact, making progress in these areas. (Exhs. H, I, J, L, Q, and S)

I find the testimony of the witnesses who testified as to the effectiveness of the student's program at the McCarton School, including the home-based program and extended day related services, to be credible. In addition, I credit the progress reports which substantiate the student's progress during his time at the McCarton School. On this record, I find that the McCarton School program constitutes an appropriate and effective educational program that is designed to meet this student's special needs, and that, therefore, the parents have satisfied the second prong of the Burlington/Carter test for reimbursement.

The final consideration in an award of reimbursement is whether equitable considerations support the award. Here, there is no evidence on the record that the parent was other than fully cooperative in the placement process or that any of the sections of 34 C.F.R. §300.403(d) that limit reimbursement apply here. There is no evidence on this record that the tuition charged by the McCarton School or the fees charged by the various providers are unreasonable. Therefore, I find that equitable factors support the parents' claim, satisfying the third prong of the Burlington/Carter test for tuition reimbursement.

I find that the parents of this student are entitled to reimbursement for the McCarton School tuition and services, home-based therapy, and extended day services of occupational therapy and speech and language therapy for a 12 month program for the 2006 – 2007 academic year.

The evidence on the record reflects that the annual tuition at the McCarton School is $84,000. (Exh. U), the cost of the home-based ABA therapy is $40/hr, the cost of after school/extended day speech and language therapy is $115/session and the cost of after

Hearing Officer's Amended Findings of Fact and Decision                    13

Case No.  107967

---

school/extended day occupational therapy is $165/session. (Exh. U, Tr. at 358 - 360)
Parents have additionally incurred the expense of in-school therapeutic services provided
by the McCarton School, including seven sessions of 1:1 occupational therapy at
$155/session and five sessions of 1:1 speech and language therapy at $80/session.
(Exh. U)

ORDER

The Department of Education is hereby ordered to reimburse Parents as follows:

1.   For the cost of tuition at the McCarton School, 2006 – 2007, in an amount
     not to exceed $84,000.

2.   For the costs of speech and language therapy and occupational therapy as
     indicated on the invoices from Cecelia McCarton  MD PC for the period
     from September 1, 2006  through August 31, 2007 as follows:  seven 45
     minute sessions of 1:1 occupational therapy weekly at a rate not to exceed
     $155 per session;  and five 60 minute sessions of 1:1 speech and language
     therapy weekly at a rate not to exceed $80/per session.

3.   For the costs of 15 hours per week of home-based ABA therapy at a rate not
     to exceed $40/hour and for two hours per week of home-based ABA
     supervision at a rate not to exceed $120/hour for the period from September
     1, 2006 through August 31, 2007.

4.   For the costs of three after school/extended day sessions of speech and
     language therapy per week at a rate not to exceed $115, and for the cost of
     three after school/extended day sessions per week of occupational therapy at
     a rate not to exceed $165/session for the period from September 1, 2006
     through August 31, 2007.

Hearing Officer's Amended Findings of Fact and Decision                    14

Case No. 107967

_____

5.   Reimbursement for Parents' expenditures for tuition and services for the
     2006 – 2007 school year as described above are to be made within thirty (30)
     days of submission of invoices and proof of payment.

Dated:  November 7, 2007
Corrected:  November 26, 2007  (Corrections made on evidence page.)

                                   *Susan K. Markus*
                                   SUSAN K. MARKUS, ESQ.
                                   Impartial Hearing Officer

SKM:ds

**PLEASE TAKE NOTICE**

        **Within 35 days of the date of this decision, the parent and/or the New York
City Department of Education has a right to appeal the decision to the State Review
Officer of the New York State Education Department under Section 4404 of the
Education Law and the Individuals with Disabilities Education Act.**

        **"The notice of intention to seek review shall be served upon the school
district not less than 10 days before service of a copy of the petition for review upon
such school district, and within 25 days from the date of the decision sought to be
reviewed.  The petition for review shall be served upon the school district within 35
days from the date of the decision sought to be reviewed.  If the decision has been
served by mail upon petitioner, the date of mailing and the four days subsequent
thereto shall be excluded in computing the 25- or 35-day period."
(8NYCRR279.2[b])  Failure to file the notice of intention to seek review is a waiver
of the right to appeal this decision.**

        **Directions and sample forms for filing an appeal are included with this
decision.  Directions and forms can also be found in the Office of State Review
website:  www.sro.nysed.gov/appeals.htm.**

Hearing Officer's Amended Findings of Fact and Decision                    15

Case No. 107967

---

## EXHIBIT LIST

| EXHIBIT | DESCRIPTION | DATE |
|---------|-------------|------|
| **Parent:** | | |
| Parent A | Demand for Due Process, 4 pages | 9/11/06 |
| Parent B | Findings of Fact and Decision, 12 pp | 5/28/06 |
| Parent C | IEP, 17 pp | 6/2/06 |
| Parent D | IEP, McCarton School, 13 pp | 2006-2007 |
| Parent E | N.Y.C. D o E. C-6 Final Notice – Initial, 1p | 7/27/06 |
| Parent F | N.Y.C. D o E. C-10 Final Notice – Change of Program, 1p | 7/10/06 |
| Parent G | Behavioral Progress Report, 3pp | 2/1/07 |
| Parent H | Occupational Therapy Progress Report, 2pp | 2/1/07 |
| Parent I | Speech and Language Progress Report, 3pp | 1/17/07 |
| Parent J | Occupational Therapy Progress Report, 5pp | 1/16/07 |
| Parent K | Educational Progress Report, 6pp | 1/12/07 |
| Parent L | Speech and Language Progress Report, 2pp | 1/07 |
| Parent M | Letter to Lois Siegler from M███ M███, 1p | 10/11/06 |
| Parent N | Behavior Intervention Report, 2pp | 9/27/06 |
| Parent O | Letter to Lois Siegler from M███ M███, 2pp | 8/14/06 |
| Parent P | Notes of School Visit to PS 94/61, 2pp | 8/10/06 |
| Parent Q | Occupational Therapy Progress Report, 5pp | 7/24/06 |
| Parent R | Letter to Martin Bassis from M███ M███, 2pp | 7/24/06 |
| Parent S | Speech and Language Progress Report, 3pp | 7/14/06 |
| Parent T | Educational Progress Report, 5pp | 7/9/06 |
| Parent U | Breakdown, Invoices, Cancelled Checks, 38pp | |
| Parent V | Neurodevelopmental Evaluation, 7pp | 1/2/07 |
| Parent W | Independent Evaluation, 5pp | 5/10/06 |
| Parent X | Resume of Molly Johnson, 1p | |
| Parent Y | Resume of Kimberly Santomossino, 1p | |
| Parent Z | Resume of Jessica Fernandez, 1p | |
| Parent AA | Resume of Jennifer Clark, 2pp | |
| Parent BB | Breakdown, Invoices, Cancelled Checks, 52pp | 2/07 - 4/07 |
| Parent CC | Breakdown, Invoices, Cancelled Checks, 46pp | 5/07 – 6/07 |
| Parent DD | Daily Attendance Record, 1p. | 2006 – 2007 |
| **Hearing Officer (i)** | Hearing Request, 4pp. | 9/11/06 |

# FINDINGS OF FACT AND DECISION

|  |  |
|---|---|
| Case Number: | 107227 |
| Student's Name: | A████ M████ |
| Date of Birth: | September 6, 2002 |
| District: | 2 |
| Hearing Requested By: | Parent |
| Dates of Hearing: | November 13, 2006 |
|  | January 16, 2007 |
|  | March 19, 2007 |
|  | May 2, 2007 |
|  | June 18, 2007 |
|  | July 23, 2007 |
| Hearing Officer: | Gary D. Peters, Esq. |

Hearing Officer's Findings of Fact and Decision                    1
Case No. 107227

## NAMES AND TITLES OF PERSONS WHO APPEARED NOVEMBER 13, 2006

| | | |
|---|---|---|
| Christina Thivierge | Attorney | Parent |
| Peggy Winkelman | CPSE Administrator | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED JANUARY 16, 2007

| | | |
|---|---|---|
| Christina Thivierge | Attorney | Parent |
| M███ M███ | Parent | |
| Leslie Weinberg | Occupational Therapist | Parent |
| Jackie Hickey | Associate Educational Director | Parent |
| Sara Kahn | Independent Evaluator | Parent |
| Peggy Winkelman | CPSE Administrator | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED MARCH 19, 2007

| | | |
|---|---|---|
| Christina Thivierge | Attorney | Parent |
| M███ M███ | Parent | |
| Eva Zzalyevsky | Head Teacher | Parent |
| Sara Baum | Speech/Language Pathologist | Parent |
| Dr. Marylyne Agin | Pediatrician/Psychologist | Parent |
| Dania Cheddie | Principal, PS 226 | Parent |
| Peggy Winkelman | CPSE Administrator | Department of Education |

## NAMES AND TITLES OF PERSONS WHO APPEARED MAY 2, 2007

| | | |
|---|---|---|
| Christina Thivierge | Attorney | Parent |
| M███ M███ | Parent | |
| Dania Cheddie | Principal, PS 226 | Parent |
| Shannon Ritterbursh | Occupational Therapist | Parent |
| Claire Higgins | Speech/Language Therapist | Parent |
| Maritza Gonzalez | Paraprofessional | Parent |
| Peggy Winkelman | CPSE Administrator | Department of Education |

Hearing Officer's Findings of Fact and Decision                                              2
Case No.  107227

---

## NAMES AND TITLES OF PERSONS WHO APPEARED JUNE 18, 2007

| | | |
|---|---|---|
| Christina Thivierge | Attorney | Parent |
| M███ M███ | Parent | |
| Deidre King | Supervisor/CARD | Parent |
| Peggy Winkelman | CPSE Administrator | Department of Education |
| Nicole Berger (Via Telephone) | Teacher, PS 226 | |
| Brigida Ciricili (Via Telephone) | Teacher, PS 226 | Parent |

## NAMES AND TITLES OF PERSONS WHO APPEARED JULY 23, 2007

| | | |
|---|---|---|
| Christina Thivierge | Attorney | Parent |
| M███ M███ | Parent | |
| Deidre King | Supervisor/CARD | Parent |
| Peggy Winkelman | CPSE Administrator | Department of Education |
| Erin Yurkeweez | Occupational Therapist | Department of Education |

Hearing Officer's Findings of Fact and Decision                                        3
Case No. 107227

## BACKGROUND

The Committee on Special Education, (CSE) convened on July 25, 2006 and determined that a three (3) year old female child, A███ M. , hereinafter referred to as "A█████", classification to be a preschooler with a disability and made a recommendation for a special class at PS 226, with a staffing ratio of 8:1:2, a 1:1 paraprofessional, SEIT for ten (10) hours, and related services including speech/language therapy, three times a week for thirty (30) minutes in a group size of 1:1 and two times per week for forty five (45) minutes outside of school, occupational therapy three times a week for thirty (30) minutes in a group size of 1:1 and for services outside of school two times per week for forty five (45) minutes 1:1.

The Parent has requested an impartial hearing, stating that procedurally and substantively, the Department of Education, hereinafter referred to as "the Department" failed to offer and or provide A█████ with a free and appropriate public education, hereinafter referred to as FAPE.

The Department maintains that the IEP generated on July 25, 2006,  provides recommendations for a FAPE with placement of the child in a community based school.

It should also be noted, that the Parent has requested a pendency order, pursuant to the last agreed upon  Individualized Family Service Plan (IFSP),  including twenty (20) hours per week of 1:1 ABA therapy and supervision, occupational therapy, two times a week for sixty minutes 1:1, physical therapy two times per week for thirty minutes 1:1, speech and language therapy five times a week for sixty (60) minutes 1:1 as well as ABA monthly team meetings for one hour.  It was the Department's position, that pursuant to Federal Regulation and IDEA, the child is not entitled to pendency as she has aged out of Early Intervention (EI) and pendency would be her educational placement. I concur with the Department's position in that pendency can not exist in the Early Intervention program.  EI programs are developed and implemented through the Department of Health, rather than the Department of Education and therefore no EI program can be viewed as an agreed upon placement between the Parent and the Department of Education, as the Department of Education was not a party to any agreement.

I also refer to 34 CFR Section 300.518 (c) which addresses a child's status during a proceeding challenging her educational program, wherein it is stated that "if the complaint involves an application for initial services under this part from a child to his transitioning from part C of the Act to Part B and was no longer eligible for Part C services, because the child has turned three (3), the public agency is not required to provide the Part C services that the child has been receiving". Clearly, there is a distinction between an early intervention program under Part C and initial education program provided under Part B and a School District's responsibility to provide a FAPE under IDEA is different from the responsibility of the lead agency, in the instant case the New York State Department of Health, to provide early intervention services.

THE PARENT'S POSITION

The Parent maintains that her child is a four year old, who is "autistic" and also has other significant health problems including severe apraxia of speech, expressive/receptive language deficits, motor feeding delays, sensory processing delays and self stimulatory behaviors.

The Parent claims that pursuant to the Burlington/Carter Analysis, the evidence will show that the Department has failed to provide A████ with a FAPE. Further, that the McCarten School is a 1:1 ABA school which also provides related services in conjunction with her extended day services. Also, it is the Parent's position that although the Department is providing ten hours of ABA services at home, she is requesting an additional ten hours.

The Parent further alleges that the IEP meeting was improperly constituted, as the only person present from the Department was Ms. Winkelman and that the other attendees were teachers, therapists, a parent member and herself.

The Parent also stated that the recommendation of an 8:1:2 classroom at PS 226 is inappropriate and that her child requires 1:1 instruction and that the staff at PS 226 would not be able to provide her child with the intervention consistent with her needs. Lastly the Parent maintains that the McCarten school is the appropriate placement for her child and that there are no equitable considerations that would bar the relief that she is requesting.

Hearing Officer's Findings of Fact and Decision                                    5
Case No. 107227

## THE DEPARTMENT'S POSITION

The Department maintains that they offered a FAPE for the 2006/2007 school year and concedes that the child was a preschooler, classified as a "preschool student with a disability" and was initially recommended for services through the Department of Education in Region I in August of 2005. At that time, she was recommended for a special class with related services and the Parents did not accept the program, did not receive any services through the Department for the 2005/2006 school year and that the child was placed at the McCarten School by the Parent.

Pursuant to an annual review on July 25, 2006, the Parent was requested to visit a recommended school program, which the Department considered to be appropriate for children on the autistic spectrum. Further, the Department maintains that pursuant to the State Department of Education Regulations, the CPSE Administrator was in fact the District Representative and is the only required member on the team, in addition to the Parent's member, and accordingly the "team" was properly constituted.

Further, the team considered the issues raised by the Parent and developed an IEP recommending a full time special class at P226 with an 8:1:2 ratio, with a full time individual management paraprofessional, speech three times a week for thirty minutes individually and occupational therapy three times per week for thirty minutes individually. In addition, a dual recommendation was recommended, wherein the child was to receive ten hours of SEIT instruction, and additional speech and language and occupational therapy. The Department maintains that this program is appropriate, as it offers a highly structured intensive educational program for the child, which incorporates appropriate educational methodologies to address the child's needs.

Lastly, the Department noted that the Parent rejected the offer in writing as to the P226 placement and related services, however accepted without prejudice, the addition of SEIT, occupational and speech therapy.

## THE PARENT'S CASE

The first witness to testify was Leslie Weinberg, who stated after being duly sworn that she is a duly licensed Occupational Therapist, presently employed at the

McCarten School and has been working with disabled children for eight years (page 19 line 6).

Ms. Weinberg stated that she currently works at the McCarten School with A███ two times a week for forty five minute sessions, 1:1 (page 20 line 11) and that the child also receives additional occupational therapy sessions from another therapist. A███ receives occupational therapy services five times a week, forty five minute sessions, 1:1 (page 20 line 25) and also two additional sessions of occupational therapy in a sensory gym outside of the McCarten School.

Ms. Weinberg was referred to her December 11, 2006 report and stated that the child displayed difficulties with sensory processing and seeks out sensory input, however often becomes over stimulated and consequently has a difficult time attending (page 22 lines 5-12).

She described an occupational therapy plan which was developed to assist the child to become more regulated and to allow teachers to follow certain activities throughout the day (page 23 lines 1 and 2). The child receives sensory breaks throughout the day and consequently has shown improved attention (page 23 lines 8/9). Other areas being worked on are the child's "gross motor skills" and "fine motor skills" which include ball skills, stair climbing, jumping and an obstacle course (page 23 lines 14-19), stringing beads/pegs, grasping utensils, scissors skills, imitating block design, coloring, buttoning skills and zipper skills. The witness stated that there is improvement in all areas.

Ms. Weinberg described weekly meetings in the classroom, where in, all the team members meet and discuss the child's progress and stated that each member of the team collects data to track both long and short term goals (page 30 lines 16-18) and that the goals are updated twice a year.

The witness described the sensory integration treatment that is provided in occupational therapy, which is designed to meet the needs of the child's nervous system and directly impact social skills and an ability to learn and perform in the classroom as well as outside the classroom and at home (page 31 lines 20-23).

Ms. Weinberg stated that when the child is not receiving occupational therapy, such as when on vacation or due to missed days, the child usually regresses in all areas wherein she previously made progress (page 32 lines 16-19). In her opinion, the child requires occupational therapy seven times per week for forty five (45) minutes in order to avoid regression and or loss of skills (page 34 lines 9-10). She stated that the child's parents are extremely involved and that there was communication with them on a daily basis (page 35 line 6).

Upon cross examination of the witness, she stated that occupational therapy is typically performed in the sensory gym and the child is usually "pulled out" of the classroom. Although the sessions are performed 1:1, there are other children in the gym at the same time receiving their own occupational therapy, which affords the ability to work on social skills (page 36 line 24).

Ms. Weinberg further testified that A▮▮▮▮has activities of choice in the gym and that she utilizes the picture exchange communication system (PECS) (page 41 line 21). Lastly, the witness stated that the child's most interfering behavior, is generally when she is seeking sensory input (page 42 line 6) generally by poking or doing things with her hands that interfere with her attending to the task.

Upon further questioning of this witness by the hearing officer, she stated that the recommendations of the IEP of July 25, 2006 with respect to occupational therapy were not adequate (page 43 line 3) and more particularly, that anything less than 45 minutes per session does not permit sufficient time for the child to become organized and ready to attend to work and focus (page 43 lines 6-16).

The next witness to testify was Jackie Hickey who stated after being duly sworn, that she possesses a Masters Degree in Special Education and also is a certified teacher and behavior analyst. She began her career as a Special Educator working in classrooms with students on the autistic spectrum and thereafter became a home ABA therapist. She is currently employed at the McCarten School as an Associate Educational Director and directly supervises staff to conduct functional analysis and assessments for writing, modifying curriculum and developing individual education plans (page 46 liens 12-16).

The witness described the McCarten School as being dedicated to educating students on the autistic spectrum, more particularly in a 1:1 intensive educational program, where there is one student to one staff person throughout the entire school day (page 46 lines 20-24). Further, the school utilizes applied behavior analysis with an integrated model, utilizing speech/language and occupational therapy as an intregal part of the clinical team (page 47 lines 1-3).

Ms. Hickey stated that Applied Behavior Analysis, hereinafter referred to as ABA is a teaching methodology, based on empirically validated research wherein each skill is broken into the smallest component and taught sequentially using positive reinforcement and shaping procedures (page 48 lines 1-6). She further stated that intensive early intervention is the most effective, particularly for early learners, however the range of functioning and severity is vast (page 49 lines 1-3). She described the McCarten School, as utilizing a verbal behavior teaching model, wherein there is integration of ABA. discreet trial teaching, errorless teaching, natural environment teaching and fluency based instruction.

Ms. Hickey also stated that data collection is essential in order to make decisions that are informed (page 51 lines 1-3) and that at the end of each day, the data is graphed and analyzed and the information is utilized to make modifications and to guide her decision making with respect to instruction (page 52 lines 17-19).

Ms. Hickey described the schools program as primarily based upon the Assessment of Basic Language and Learning Skills (ABLLS). Each child has a full ABLLS evaluation, wherein a specific individual plan is developed based upon the child's unique strengths and or weaknesses (page 53 lines 21-22).

Ms. Hickey described autism as a dysfunction in the normal developmental process, and usually occurs in the first two years of life (page 55 lines 1-2). More particularly, children develop impairments in communication / language, cognition skills social and play skills and adaptive behaviors. Children on the autism spectrum, in order to learn, must have basic readiness and foundation skills which must be intensively taught (page 56 lines 1-2).

The witness stated that A███████ has been attending the McCarten School since September 2005 and she presents as a highly distractible child with great difficulty in attending and shifting attention (page 57 lines 17-19). Further, she has a rigid learning style, often eliciting tantrum behaviors, and also has severe expressive/receptive language delay (page 57 lines 17-23). Initially in terms of cognitive and readiness skills, the child's rate of acquisition was slow.   In terms of gross motor movements, it took her approximately one month to acquire each new movement (page 58 line 13); however, from September 2006 through the date of the instant hearing, the child has acquired over fifteen gross motor movements.

Ms. Hickey stated that the child is ready to begin to work with video modeling and peers to assist in acquiring expressive language skills, and that she is beginning to imitate sounds, however due to the motor planning and apraxia, it is most difficult (page 59 line 8).

A██████ is on a stringent behavior plan, to monitor her tantrums and the "token economy" is utilized to help reduce tantrums (page 60 lines 14-19). Rigid behaviors are immediately interrupted and blocked and she is directed to task (page 61 lines 11-12). Interfering behaviors and self stimulatory behaviors are also blocked wherein the child is paused, to stop the behavior and to continue the activity (page 61 lines 15-19).

The witness was directed to Parent's Exhibit "I", which was A██████'s behavior plan and she testified and described the behavior and techniques utilized in engaging said behavior. She also stated that there is a person in the classroom who is responsible for home to school coordination and to visit at the home two hours per week to work directly with the parents, and to coordinate with the ABA home staff.

Ms. Hickey also described the child's receptive language difficulties and noted that her rate of acquisition, in terms of receptive discrimination skills has increased (page 70 line 12). This process requires an enormous amount of repetition and prompt fading procedures (page 70 lines 15-16). She described the child's attention skills as varying and fleeting, depending upon the structure of the activity (page 71 lines 8-10). A██████ was receiving reinforcement for attending and responding quickly and became successful and

her skills increased (page 72 lines 15-16). The witness also described progress with respect to "eye contact" and noted that her cognitive skills were improving (page 74 lines 6-9). Ms. Hickey also described the child's difficulties in the area of fine and gross motor delays and noted that she has an immature grasp, when utilizing writing utensils (page 75 line 4). Presently, she is able to run and jump, and is beginning to integrate peers into some interactions (page 75 line 14). She also noted that A████has made tremendous progress in terms of training (page 75 line 17) and can drink from a cup, feed herself utilizing a fork and spoon (page 76 lines 5-9).

Ms. Hickey stated that A████is in a classroom with one other child, three ABA therapists, one speech and language pathologist and that she is with a teacher every moment throughout the school day (page 78 lines 9-10).

Upon further questioning of the witness, she stated that in her opinion, the child would not be able to make progress in an 8:1:2 setting (page 79 line 21) or a 6:1:1 setting (page 79 line 24) as she required each learning situation to be highly structured, more particularly to be broken down into the smallest component and taught purely (page 80 line 5).

Ms. Hickey testified that Eva is the head teacher  is responsible for organizing the classroom schedule and in establishing home to school coordination and parent training (page 81 lines 11-14) and that Rebecca is responsible for the child's data collection, updating IEPs and report writing. The witness also stated that she is personally responsible to work with Eva on all report writing, updating IEPs and data collection. Also, the entire team including teachers, therapists, and herself were responsible for accomplishing a base line for developing the IEP (page 82 lines 21-23).

The witness stated that in her opinion, A████ "absolutely" requires a home program and that she should have at least 20 hours of ABA from Monday through Sunday each and every day (page 84 line 1). It was her observation that even in the absence of three days from school, there is an increase in interfering behaviors (page 84 line 10).

Ms. Hickey stated that a maintenance program for A⬛ would assure that previously acquired skills are intermixed throughout the school day and that if a skill is "rusty" it goes back into the acquisition rotation (page 89 lines 10-11).

Ms. Hickey was directed to Parent's Exhibit "C", which was the District's proposed July 25, 2006 IEP and disagreed wherein, it was stated that "assistive technology devices" were unnecessary (page 94 line 12) and also that A⬛ would not be able to learn without 1:1 instruction (page 118, line 23).

The witness again reiterated that an 8:1:2 setting would not afford the child with the ability to learn and given her variable limited attention and eye contact and an ability to shift attention, she would engage in high rates of self stimulatory behavior and be completely overwhelmed (page 96 lines 15-19). Further, it is essential that such a child be taught by a highly trained staff across all areas of applied behavior analysis (page 97 lines 3-4).

Upon cross examination of this witness, she described a typical day in the classroom at the McCarten School and also stated that there are team meetings wherein Dr. McCarten, Ivy Feldman, the Attending Therapist and the entire ABA staff meet one time per week.

Ms. Hickey stated that the behavior plan that was formulated targeted a rigid muscle tensing behavior, which was the most prominent behavior (page 107 line 9). When that behavior was dissipated, then the next most intrusive behavior would be worked on (page 107 line 16).

Ms. Hickey also described an intensive play date with another child, one time per week wherein she is working on play skills as well as exchanging and utilizing functional communication systems (page 108 lines 20-23). This session is for approximately thirty minutes one time per week and that A⬛ submits to a tremendous amount of pre teaching prior to the session (page 109 lines 22-23). The child has made appropriate educational progress during the time she was at the McCarten School (page 120 line 3) and that the McCarten Staff prepared a behavior intervention plan (BIP) by utilizing the functional behavior analysis (FBA). The data collected in the FBA was collected over a

Hearing Officer's Findings of Fact and Decision                                    12
Case No. 107227

period of multiple days and sessions. The witnesses was directed to Exhibit "E" and stated the goals and objectives provided formed the basis for an appropriate educational plan to enable the child to learn (page 122 line 6) and that the goals as implemented for A████ were in the least restrictive environment (page 122 line 12).

Upon redirect examination of this witness, she stated that with reference to the Parent's Exhibit "C", IEP dated July 25, 2006, on page 11, the recommendation that a "reduction in self stimulatory behaviors, including muscle tensing and eye gazing" is vague as it is not specific enough and also wherein strategies are described to change the behavior, more particularly that the teacher will ignore inappropriate behaviors and reinforce appropriate behaviors is not a successful plan for A████ (page 122 line 23). In her opinion, inappropriate behavior should not be ignored, but instead be blocked, with a specific strategy in replacing it with an appropriate behavior. Also, the witness stated that in her opinion the strategies as outlined in the purported behavior plan was not satisfactory for the child (page 125 line 21) and to the best of her knowledge, no one from the Department came to the McCarten School to observe the child in her classroom (page 126 line 8). Therefore, the Department could not have any baseline data in order to formulate a BIP.

The witness also stated that the McCarten School does offer community outings on a daily basis, more particularly, daily walks in the community, scheduled trips to the grocery store, to exchange items for their tokens, as well as going to the zoo (page 127 lines 17-23). There is also opportunity to interact in the "food group" wherein A████ has the opportunity to watch other children eat and to model same (page 128 lines 12-15).

The next witness to testify was Sarah Kahn who stated after being duly sworn that she is a Board Certified Behavior Analyst and has a Bachelors Degree in Psychology from UCLA and a Masters Degree in Special Education, with an emphasis in applied behavior analysis from Teachers College at Columbia.

The witness testified that she has been working with children on the autistic spectrum since 1995 both as an analyst and as a supervisor. She has worked with children from 18 months old to ten or eleven years and stated that she did an independent

Hearing Officer's Findings of Fact and Decision                                    13
Case No. 107227

evaluation of A█████ at the Parent's request at the McCarten Center (Exhibit "R"). At the time of her observation, she described the child as exhibiting moderate difficulties in all areas and just beginning imitation skills (page 141 line 19). Also, although she did not have expressive language skills, she was learning to expressively request, by using the PECS System (page 142 line 6) and was in the process of acquiring further training skills, however also demonstrated a very high rate of self stimulatory behavior (page 142 line 15).

During the witness's observation she noted the teachers in the classroom were implementing a BIP to reinforce other types of behaviors. The plan was essentially proactive; in trying to present instruction at a fast enough pace to keep reinforcement at a high level (page 143 lines 5-7). With reference to the child's cognitive skills, they were described as significantly delayed, as compared to developing children of her age (page 145 lines 2-3)

The witness described the child using the PECS Book for a variety of single symbols and noted that she exhibited learning (page 147 line 2). She further stated that A█████ requires 1:1 teaching and it is appropriate, as she is unable to learn in a more distracted and more populated environment (page 147 line 17) and that the goal of 1:1 teaching is to get the child to have a basic enough level of receptive language, so that they would be able to follow direction in the classroom (page 148 line 16) and progress to a less restrictive placement. Essentially ABA slowly builds up skills to more advanced levels and reduces the level of prompting required for the child (page 149 line 3). Also a child needs to exhibit an ability to learn incidentally more often, before moving into a more populated classroom (page 149 line 16) and at the present time, A█████ does not have the ability to learn incidentally (page 150 line 5).

Ms. Kahn described the McCarten School as utilizing discreet trial teaching in a 1:1 setting and also providing for different services such as occupational therapy; physical therapy, etc (page 150 lines 10-14) while utilizing the ABLLS, which is the standard assessment tool required to provide learning.

Hearing Officer's Findings of Fact and Decision                                    14
Case No. 107227

She observed the staff constantly taking data, depending upon how the child is demonstrating the skills they are teaching (page 152 line 7). She communicated with the child's teacher and supervisor and stated that they utilize a multidisciplinary approach, due to the child's high level of sensory needs (page 152 line 20). They also reported to using many visual schedules with A⬛⬛⬛ to help her transition from activity to activity (page 153 line 5)

The witness was directed back to her report wherein she recommended that the child have 35 to 40 hours per week of ABA services. She reiterated that ABA was crucial, as it is a system of teaching, where prompting is faded out systematically, and that non ABA teachers typically would not have the level of expertise to know levels of prompting etc. (page 154 lines 6-9). Also, if the child was not in a system where prompts are appropriately faded, they would become prompt dependent (page 154 line 20). She described the McCarten School as appropriately working with prompt fading and generalization (page 155 line 8).

Upon further questioning of the witness, she stated that if the child had a management paraprofessional in an 8:1:2 setting, such as at P 226, the paraprofessionals do not have ABA training, and would be unable to keep the reinforcement level at a high rate (page 156 line 16).

Ms. Kahn observed the program at P226 in the 8:1:2 classroom (page 157 line 6) and was told that the curriculum was based on thematic units and that the program was not ABA (page 157 line 24). It was the witness's impression that the program would be "over A⬛⬛⬛'s head" and that she would not be able to acquire new skills (page 158 lines 5-6). She also believed if placed in such a classroom, A⬛⬛⬛ would begin to engage in self stimulatory behaviors after a couple of minutes (page 152 lines 12-14). She was also told by the teacher at P226, that behavior plans would be developed for the children after she got to know them (page 163 line 14) and that they would be reviewed on a quarterly basis. She was also told by the teacher that there was no plan in place that systematically reviewed old or learned skills as new ones were being taught (page 164 lines 18-19). In

her opinion, she believed that A█████ would regress in many of the skills that she has acquired and would fail to learn new skills. (page 166 lines 2-5).

Ms. Kahn stated that based upon her observation, that the child's current extended day program in conjunction with the McCarten School is vital for her (page 167 lines 14-15) as she generalizes the gains she makes at school and brings back into the home. Further, 20 hours per week of ABA services at the McCarten School is not sufficient and would not be enough for her to learn (page 168l line 5). She also noted that at the McCarten School, there were opportunities for the child to have interaction with other children (page 170 line 8) through lunch and "small circle time" in the morning.    In conclusion, the witness stated that the McCarten Center was an appropriate placement for the child as it demonstrated all of the characteristics in providing an education that the child requires.

Upon cross examination, the witness stated that she does some incidental teaching with children that don't have a spectrum diagnosis, but who are simply a "little bit" delayed (page 172 line 19). Also, she is "not married" to the ABA approach, but in her opinion while other approaches could be sufficient for other children, ABA is the "most" appropriate for A█████.

Ms. Kahn also stated that she spoke to the teacher at PS226 about a language communication system and noted that she was using something called the "Mayer-Johnson Program" (page 177 line 8). She also commented that the teacher did not tell her that they used the PECS system (page 178 line 5) and was informed that the teachers do provide redirection to get the kids back on track, however they did not specify the type of methodology that was utilized (page 178 line 15).

The witness stated that A█████ did not yet have the skills to imitate other children and even if the best role models were in the classroom, A█████ was not up to the task of observing those children and learning from them (page 181 line 17).

Upon redirect examination of the witness, she stated that the children she observed at P226, seemed to have had many more skills than A█████ did and were communicating in a way far better than what A█████ is currently able to

Hearing Officer's Findings of Fact and Decision                        16
Case No. 107227

(page 192 line 5). She also believed that A⬛⬛⬛⬛, if left to play with another child in the room, with no prompting or interaction from a teacher or parent would not play with the child and or would begin to engage in self stimulatory behaviors (page 193 lines 8-11).

The witness stated that she has knowledge of the "TEACH" methodology, and that it is very different than ABA as it does not have a behavioral component (page 193 line 25). She was also familiar with the "GREENSPAN" approach and stated that it did not have a behavioral component (page 194 line 7). Typically, "GREENSPAN" is used with children with Aspergers Syndrome and much higher functioning. She also described the "TEACH" approach as a visual based approach (page 195 line 6) and that in her opinion, that A⬛⬛⬛requires cognition and language skills needed to communicate with other people (page 195 lines 14/15).

The next witness to testify was Eva Szalyovsky who testified after being duly sworn; that she was the head teacher at the McCarten School (page 203 line 14) is completing a course to become a Board Certified Behavior Analyst and has a Masters Degree in Psychology from Hunters College.

Ms. Szalyovsky began working at the McCarten School in 2002 and received intensive training for several weeks in all the major areas of ABA (page 207 line 8) and currently works closely with Jackie Hickey who is the Associate Director at the school. She is a lead therapist in the classroom which accommodates two children and there is also a speech therapist, and occupational therapist that works with the children. The witness stated that she essentially supervises and trains other teachers in the classroom, monitors the data, modifies the child's programs and assists in the development of her IEP and educational progress reports (page 210 lines 9-12).

Ms. Szalyovsky described how the data is recorded and analyzed through very specific targets and noted that the data is graphed. She described weekly team meetings attended by all personnel including the teachers, ABA therapists, occupational / speech therapists and the director and associate director of the school (page 211 lines 4-6). She also stated that the child receives home to school coordination two times per week and that she goes to the child's house and works with the home team and with the parents as

required (page 211 lines 19-23). The main objective of the home school coordination is consistency and working on skills (page 212 line 6).

The witness was directed to her progress report dated December 18. 2006 which indicated significant delays in all areas, including expressive language receptive language, social interaction, academic skills, attention and gross motor functioning (page 213 lines 1-3). She described the child making progress through utilizing her PECS system and has made gains in areas of expressive language skills (page 215 line 5).

The witness noted the child's self stimulatory behaviors and rigidity are "huge areas" that interfere with her functioning and that as a result she requires 1:1 attention (page 215 lines 21-25). Attempts are made to target the most interfering behaviors which impede progress and learning. Behavior plans are developed (page 217 lines 8-10) wherein Baseline data is gathered across multiple situations and multiple days and incorporated into a functional analysis plan (page 218 lines 2-8). The behavior plan is developed through the above and implemented by everyone on the team including the therapist (page 218 lines 18-20).

The witness stated that A███ has successfully reduced interfering behaviors through the use of the behavior intervention plan (page 219 line 16) and although she was still showing significant delays in her receptive language skills, she has made steady gain, since the school year has begun (page 220 lines 12-20).

Upon further questioning of the witness, she emphatically stated that A███ is not a child who can learn pre academic or academic skills in a less restrictive setting than 1:1 (page 228 line 22). Also, in her report, she recommended that A███ receive continued treatment using a 1:1 model and reiterated that without constant 1:1 supervision, redirection of inappropriate behaviors, the child would not be able to pay attention at all and would be unable to learn (page 235 lines 20-24).

Ms. Szalyovsky attended the 2006/2007 IEP meeting and stated that all those present except for Ms. Winkelman recommended a 1:1 ABA school placement for A███, with an extensive day of ABA at home (page 237 lines 14-16). The witness also stated that to her recollection, Ms. Winkelman recommended ten (10) hours of ABA

Hearing Officer's Findings of Fact and Decision                                    18
Case No. 107227

services at home, however the other members present at the meeting recommended twenty hours (20) of ABA services (page 238 line 16). It was her opinion that the child needs to generalize skills learned at school and  requires as many hours of therapy at home as possible (page 238 lines 20-24).

Ms. Szalyovsky also stated that the goals as set forth in the IEP could not be implemented in an 8:1:2 setting, as they were written specifically for 1:1, in an ABA setting (page 243 line 9).

Upon cross examination, the witness described a typical day in the classroom, including circle time and the token economy and described the child's occupational therapy sessions in the sensory gym, (page 262 lines 7-11) and stated that fine motor skills and sensory integration approaches are utilized (page 263 line 1).

Lastly upon redirect examination, the witness stated that A█████ does interact with others and also goes out into the community, including different stores where she has the opportunity to interact with other children in that setting and also at a playground (page 269 lines 14-19). Also, the ultimate goal for A█████ is for her to be able for her to function in a typical school setting in a less restrictive setting with less facilitation from an adult and more spontaneous interaction with other children (page 270 lines 10-16).

The next witness was Dr. Marlene Agin, who testified after being duly sworn, that she is a neurodevelopmental pediatrician and speech pathologist. She also authored a book entitled, The Late Talker , 2003, which is a book for professionals and parents to know how to identify a child with developmental/speech/language delays. She is also published in Pediatric Journals and Magazines, regarding children on the autistic spectrum (page 279 lines 3-11). The witness described the characteristics of autism including deficits in social interactions, communication impairment and stereotypical patterns of behavior, often self stimulatory (page 282 lines 1-11).

Dr. Agin evaluated A█████ on May 17, 2006 and wrote a report in connection with the evaluation (Exhibit Q) (page 283 line 5). She was diagnosed with a pervasive developmental disorder (PDD) , as listed in the DSM-4, in the American Psychiatric Association Manual (page 283 lines 10-13). She further stated that A█████ was a child

who presented herself and did not respond to directives and preferred to go off on her own (self directed) (page 285 line 19) and needs constant redirection. The witness also administered an evaluation known as "the autism diagnostic observation schedule (ADOS)" which was described as a standardized test for child on this spectrum (page 286 liens 8). Dr. Agin stated that A█████ scored a 20 on the ADOS scale and stated the diagnosis of autism would be 12 or greater and her diagnosis was "severely autistic" (page 288 line 11).

　　　　Dr. Agin stated as per the last page of her report that A█████ can't learn incidentally and that if left to her own devices, she would wander around a room and she did not have the ability to absorb what is in the environment (page 294 lines 19-21). Further, it was the witnesses opinion that the child could not learn and was unable to engage in an unstructured situation (page 295 line 2) and that it was her recommendation that A█████ requires a 1:1 teaching environment and that continue her education at a 1:1 ABA school (page 295 line 10) as she does not have the skills to learn in a classroom with a less restrictive environment. She also stated that she read all of the evaluations available to her and agreed that over vacation, or when A█████ does not receive structured teaching, she would regress (page 296 line 4). Further, it was her opinion that if A█████ was recommended to an 8:1:2 classroom with a 1:1 paraprofessional, that would not be appropriate for her (page 296 line 10). She felt the setting would be too high a ratio of student to teacher and that the child would probably simply engage in self stimulatory behavior and would be unable to learn (page 196 lines 13 – 16). Dr. Agin also recommended 6 hours per week of occupational therapy and stated that without same the child could not maintain and grow in learning skills (page 297 line 7). She also recommended 7 hours per week of speech and language therapy, as this is probably the child's greatest deficit (page 297 line 15). Lastly, the witness stated that the child requires an additional "20 hours" of ABA at home or after school services (page 300 line 9) and if the child did not have same, she would regress into self stimulatory behaviors (page 300 line 15) and ten hours per week of ABA services would not be sufficient (page 301 line 1 3).

Upon cross examination of this witness, she stated that she had not observed A███ at school (page 302 line 6), however has observed other programs for autistic children other than the ones at the McCarten Center.

Dr. Agin also stated that although it was positive that the child showed affection and some eye contact to her mother during her observation, however these behaviors were not consistent and brief (page 305 liens 2-3). She also stated that it would not necessarily be beneficial for A███ to have more children in her classroom, in order that there be more opportunity to interact and or socialize (page 306 line 8) and that smaller the student to teacher ratio, the better the results would be (page 306 lines 23). For teaching purposes, the child would learn best 1:1 in a small group and should have the ability to be with other children in other settings (page 306 line 25).

Dr. Agin stated that she has observed other programs such as TEACH and Greenspan, however due to the lack of structure and the reinforcement schedule, these would not be appropriate for A███ (page 308 lines 18). She also stated that although A███ is turning five (5) and almost ready for kindergarten, it would not necessarily be beneficial to attempt other methodologies (page 309 lien 2).

The next witness to testify was Sara Baum, who testified after being duly sworn that she has a Masters Degree in Speech Pathology and is a Licensed New York State Speech Therapist. She is currently employed at the McCarten Center and has been so employed for the past seven and a half years. As a speech pathologist, she provides direct service every day, as well as weekly evaluations and school observations (page 313 lines 6-8). Also, approximately 80 to 85% of the children that she works with are on the Autism Spectrum (page 313 line 20).

The witness stated that she currently provides speech and language therapy to A███ and sees her five times per week, individually, for sixty minute sessions. She described A███s deficits in the receptive language area, as having motor/verbal motor/oral motor planning disorders which affect her expressive language skills (page 317 line 1). She also described her augementive system as being developed through the picture exchange communication systems (PECS), noting that she is making progress

(page 318 lines 1). She also stated that her oral motor weaknesses impact her articulation and that she works on strengthening her muscles (page 320 line 6). She also works with the child to improve her jaw grating abilities for improved speech production (page 321 line 1).

Ms. Baum further testified that when she first began working with the child on September 2006, she always needed to have her PECS book in front of her to communicate, however, at the present time she is now able to go to get her PECS book when required and to bring it with her in order to communicate, and described significant progress utilizing the PECS system (page 324 line 5).

Upon further questioning of the witness, she indicated that she tracks the child's progress through data (page 324 line 9) and assurances are made that the child has achieved her goals before moving on to other environments.

Ms. Baum also stated that although A▇▇ has self stimulatory and inappropriate behavior, that same has decreased during the time that she has worked with the child (page 326 line 25). She also noted that the child's focusing and attending skills have improved, due to a decreased amount of children in her classroom (page 327 line 8) and her 1:1 instruction with consistent structure.

Ms. Baum stated that if A▇▇ was provided with speech/language therapy, by a therapist not trained in "prompt", she believed the child would shut down (page 328 line 3). It was the witness's recommendation that the child continue to receive therapy five times a day for sixty minutes at school and twice a week for forty five minutes outside of school, and that she requires that level of intensity in order to accomplish her goals. More particularly, the after school component is important in order for her to generalize what she has learned at school (page 329 line 6). The witness also described team meetings with a school and home team and that she spends at lease fifteen to twenty minutes per day with A▇▇'s mother, so that she is kept apprised of the child's progress. She also reported that on holiday breaks and vacation the child regresses and needs an adjustment period to reacclamate to school upon her return.

Hearing Officer's Findings of Fact and Decision                                     22
Case No. 107227

Ms. Baum also described a "token system" wherein the child responds to rein forcers, including toys, verbal praise, hugs and or smiles (page 332 lines 1-5).

Upon cross examination of the witness, she did state that the child exhibits a great deal of distractibility however, is now able to filter out some measure of the distractibility and remain attending to what she needs to do and has been able to gradually deal with background noise and visual distraction (page 334 lines 11-15).

Lastly, the witness stated that with reference to page "9" of the child's IEP, the recommendations for speech and language therapy in a separate location three times a week for thirty minutes 1:1 and for forty five minutes outside the school twice a week 1:1 were not appropriate, (page 388 line 8). As the sessions were too short, and that by the time the child transitions into the therapy session, there would not be enough time to accomplish much else.

The next witness to testify was Danie Cheddie who stated after being duly sworn that she is currently the school principal at PS 226. She described her school as having five sites with two inclusionary class programs and there are pre kindergarten programs at the 12th Street site in New York City, New York (page 347 lines 7), including three classrooms with eight children per classroom (page 348 line 14). All three classrooms were for children with Autism (page 349 line 13), and follow the New York State Requirements for the Pre K Special Education Classes, and provide for related services such as speech, occupational and physical therapy, if required (page 350 line 1). The students also have an opportunity to socialize through a program called the "Treatment and Education of Autistic and Related Communication Handicap Children". The curriculum focuses on social/emotional development, including play activities, socialization/communication skills, physical development, creative play/expression activities and integrated activities such as activities to daily living, etc. (page 354 lines 1-5).

Ms. Cheddie stated that different aspects of ABA, natural environment and TEACCH are being utilized (page 354 lines 12-15), and is a natural environment program

wherein data is collected and incorporated into a portfolio. The child's work is collected in order to determine if goals are being accomplished.

Ms. Cheddie stated that she is trained in Applied Behavior Analysis, however is not certified. She also stated that there are eight students, two paraprofessionals and a teacher in each classroom (page 362 line 24), and that many of the teachers were trained in working with children on the Autism Spectrum and the staff is also trained in TEACCH.

Ms. Cheddie testified she never met A███, but was aware that she was recommended for an 8:1:2 classroom at the West 12th Street facility (page 357 lines 4). In making a determination as to whether or not a child is suitable for the program, different factors are considered including age, functioning level, mandates on the IEP including behavioral/social needs and academic needs (page 368 lines 3-10). In the current school year, the children range in age, usually three to four years old in the 8:1:2 classrooms (page 368 lines 15-18).

The witness stated that when a child begins class in September, within a month or so, an assessment is done to determine the appropriate program. The witness also stated that although components of the TEACCH model are used, the school utilizes their own informal assessment for creating a program not necessarily the TEACCH model (page 373 lines 10-12).

The witness stated that in the 8:1:2 program, if a child has interfering or problem behaviors, a FBA is completed to track behaviors (page 376 line 23) and a behavior intervention plan is completed to address the problem behaviors. She also described "school based coaches" as being certified and doing training throughout the city and assisting with FBAs. Paula Boldingreen is the school based coach, and works with the teachers and other staff members and is also an autism coach (page 381 lines 1). The actual BIP is prepared by the teacher with input from the Parents and anyone else who works with the child (page 382 line 5).

Upon cross examination of this witness, she reiterated that ABA is just one aspect that is utilized in the classroom and that in her opinion, ABA alone, would not be an

appropriate methodology (page 384 line 9). In her opinion children would benefit from the philosophy of pulling different programs and systems, which he described as the "holistic approach" (page 384 line 13). She described this philosophy as more realistic as to what is in the real world and that it provides the children with the opportunity to interact with each other and learn all skills necessary to improve.

The witness also stated that the program at PS 226 would be appropriate, despite the Parent's letter declining same. The program has evolved over a forty year period and incorporates some of the best aspects of all different philosophies, wherein the children can generalize what they have learned and transfer and use same outside the educational setting (page 386 lines 12-15). She also agreed that there are children with very intense management needs in the 8:1:2 program at PS 226 and that their needs are provided for in the classroom through behavior plans which are put in place and revisited and modified as required.

Upon further questioning of the witness, she stated that for a child such as A███ who is basically non verbal, it would be important for her to have more verbal children as role models (page 391 line 15) and also that the child should have an opportunity to play in small groups with other children (page 392 lines 5-7).

The witness was directed to the child's IEP and stated that the goals as listed could be implemented at PS 226 (page 399 line 21). Also, the PS 226 program was evaluated by a school quality review team from Cambridge University, England, and received quality ratings.

Upon redirect examination of this witness, she reiterated that in her opinion, ABA alone was not an appropriate way to teach children on the spectrum, however, her opinion is not based on any actual study.

The witness also stated she did not recall any child that has "not" benefited from the program and or has not been able to transfer their learning style from other schools after entering her school. Ms. Cheddie also stated that parents also have the opportunity to benefit from the school program and that her school is affiliated with the Manhattan Chapter of the Autism Society at the Mount Sinai Hospital, as well as with other

organizations throughout the city. There are also parent workshops wherein several agencies and organizations provide services for the parents and their children.

Lastly, upon redirect examination the witness stated that she does understand that ABA is a scientifically based program, however is not aware that they are the only one that has ever clinically been studied. She also reiterated that the PECS system is utilized in the school; however that she did not believe that the staff was Certified in the PECS.

The next witness to testify was Claire Higgins, who stated after being duly sworn that she is a New York State Licensed Speech Pathologist and has trained in working with children with Autism. She is trained in "prompt" and PECS, and utilizes same, however is not certified. She received her training at the Birch School, Rutgers's University, from the Department of Education/Citywide Speech Services.

The witness stated that she works at the West 12th Street School and provides Speech Services to 19 children (page 468 lines 2) and provides 9 therapy sessions per day in a variety of contexts, as well as doing instructional lunch programs (page 468 lines 9-15).

When a child such as A███ comes to the program with an IEP that already provides for speech/language goals, she would do an assessment to assure that the goals are appropriate (page 470 line 15). She also stated that several providers including speech pathologists, occupational therapists classroom teachers and paraprofessionals utilize PECS. Ms. Higgins also stated that she was trained in doing discreet trial / ABA and was aware that the discreet trial is only one component of the program (page 482 line 1).

Upon cross examination of this witness, she was directed to the IEP and page 3.1 and stated that there are other children that she provides services for that are similar to A███ in terms of their abilities (page 486 line 8) and that in her opinion, having exposure to more verbal children would be educationally beneficial to a child (page 487 line 13).

Upon redirect examination of the witness, Ms. Higgins stated that she collects data, regarding speech goals by utilizing session notes and by observing different aspects

Hearing Officer's Findings of Fact and Decision                              26
Case No. 107227

of therapy (page 491 lines 13-15). More particularly, her daily plans generally include a target number of times to observe certain behavior and then the target behavior is tracked in her notes (page 492 lines 8-12).

The next witness to testify was Shannon Ritterbush, who stated after being duly sworn, that she is a New York State Occupational Therapist and has a Bachelors Degree in Occupational Therapy and a Masters Degree in Psychology. She has worked with children on the autism spectrum since 1999, with children from approximately 12 months old through 10 years old and has been trained in sensory integration techniques and is a Certified Provider of the "listening program".

The witness described the West 12th Street location and stated that there is a sensory gym with equipment including a vestibular swing, swing attachments, mats, wedges, balls, bean bags, etc. At the present time, she provides services to twenty children at the school and, to one other child privately.

Ms. Ritterbush stated that when a child enters the school, they usually come in with an evaluation from the CPSE and same is reviewed (page 507 lines 1). The child's case is reviewed to evaluate their sensory and fine motor needs, and observations are performed and memorized. Upon completion of the observations, a treatment plan is prepared, including standardized check lists (page 507 lines 17-20).

Upon further questioning of the witness, she stated that she has reviewed A▮▮▮▮s IEP and noted that IEPs such as A▮▮▮▮s have been written in the summer or prior thereto and often need to be changed. Further, autistic children change quickly and that the observations will determine if the changes need to be made.

The witness also stated that if a child such as A▮▮▮was to receive occupational therapy, individually, three times per week for thirty minutes, this would generally be accomplished through "pull outs", however if there was a particular need, the service could be provided on a "push in" basis (page 515 lines 1-4).

The witness also stated that she has received training in behavioral intervention (page 515 lines 18) and has received training in ABA and TEACCH.

Upon cross examination of the witness, she stated that she would regularly go into the classroom and assist the teacher on issues concerning children with sensory difficulties. More particularly, she stated that every child is on a "sensory diet" that is performed throughout the school day (page 521 lines 8-10), and that the occupational therapy plan is "evolving", with the goals are always modified and tweaked as required (page 522 lines 10-12).

Ms. Ritterbush also stated that the children who are on a sensory diet have material sent home and the parents are kept advised as to how they can implement and work on the sensory diet at home (page 523 lines 1-4).

Maritza Gonzalez was the next witness to testify and stated that she has worked at PS 226, West 12th Street, for 19 years and has worked with children on the Autism spectrum. She currently works in the Pre K Program as a paraprofessional, and has received training in behavioral management needs for children on the Autism Spectrum. She also testified that she is part of the 8:1:2 classroom team and that her responsibilities include assisting the children whenever they require help. She has been trained in PECS and follows lesson plans that the teacher writes.

Upon cross examination of the witness, she stated that as a paraprofessional, she assists the children in their individual work and in the implementation of "their sensory diet".

The next witness to testify on behalf of the Parent was Deirdre King, who stated that she has a Masters Degree in Early Childhood Special Education and is currently enrolled in a Masters Program for Psychology. The witness is employed by the Center for Autism and Related Disorders (CARD) and is a Case Supervisor (page 657 lines 3-4). She has been employed at CARD for six years and began as a Junior Therapist, was promoted to a Senior Therapist and then to a Supervisor. She is trained in writing IEPs and works directly with families and their children. Her duties currently include supervising cases for children and in providing direct SEIT Services.

Ms. King stated that her agency contracts with the city and currently provides services to A█████ pursuant to IEP recommendations made by a CPSE (page 658 line 19).

Ms. King stated that CARD began to provide services for A████ in April 2007, and was informed at that time by her mother, that the services that the child had been receiving were not being fulfilled by the agency that was utilized previously (page 659 lines 7-9). Subsequent to being contacted, the witness met with Ms. M████ and it was determined that she had hours available for the child and the services were initiated.

Ms. King stated that CARD provides approximately 20 hours per week of services, and that the IEP provides for and that the Department pay for ten hours and that the Parent pays for an additional ten hours of private services.

Initially, after meeting with the Parent, an informal assessment was performed and the witness went to observe the child at her school and met with her teacher and director, to obtain background information about the child (page 662 lines 1-7). A baseline assessment was made, and a plan instituted. As part of the CARD program, the witness stated that the staff takes data on every trial.

Ms. King testified the child has exhibited major gains in her ability to generalize things that she had learned at school, and has the ability to use more of expressive language skills and is also using the bathroom more consistently. Also, improvements have been documented in behavior management, most notably screaming has been "lower and less frequent" and that her ability has improved in transitioning into sessions (page 664 lines 19-25).

Upon further questioning of the witness, she stated that her staff communicates daily with the Parent and described her as being very involved in the program (page 667 lines 3). She also stated that the Parent should attend all of the team meetings and that she has assisted and easily accepts suggestions.

Ms. King stated that she did have an opportunity to observe the child at the McCarten School and felt that the school was an appropriate setting and that the child responds well to 1:1 instruction and utilize the PECS system (page 669 lines 1-3). She

also reiterated that she is in agreement that the twenty hours of ABA services provided after school and on the weekends is essential. More particularly, she described the child as being unable to structure her time if she did not have the services and also that the Parent requires training on after school activities (page 669 lines 18-23). She described A███ as still displaying delays in language/communication/play skills and that she requires more structure time in order to improve (page 670 lines 1-3). She also stated that if the child did not have structure at home, then she would most likely spend time wandering around and not engaging in play or any other structured learning opportunities (page 670 lines 15-19). Also, if the child only had a school program with no extended day or weekend hours, there would be no improvement in learning additional skills to generalize at home and there would likely be an increase in inappropriate behaviors and or tantruming/screaming at school with regression (page 671 lines 9-19).

Ms. King also stated that traditionally when there was a break in services, such as the last school vacation, the child was more resistant for sitting for structured activities and that there was an increase in inappropriate behaviors such as crying/tantruming (page 673 lines 1-6). Lastly, the witness stated unequivocally, that A███ requires a 12 month program with services such as the one currently in place (page 673 lines 10).

Upon cross examination of the witness, she stated that CARD is ABA based, however, they follow the child's lead and that the services are individualized (page 674 lines 20). Although ten hours of ABA services are beneficial, 20 hours of services have provided the child with additional opportunities to practice skills and is appropriate. (page 675 lines 19).

The last witness to testify was the Parent, who stated after being duly sworn that A███ was first diagnosed with Autism when she was fifteen months old and that she also has another child who is six and a half years old with the same diagnosis. She described A███ as an enjoyable, lively playful child with "extreme deficits" (page 678 lines 25), including expressive language difficulties.

The Parent stated that at home, A███ will wander around unless someone is with her, initiating play or engaging her (page 680 lines 11-13). A███ is able to utilize

PECS and has become efficient in asking for food and or drink. She also stated that when she takes her child out without a therapist, to walk, her focus is always down on the ground (page 681 lines 10-12). She also described her child as not always being aware of her surroundings (page 681 lines 24) and that she generally does not "clue into" what is going on around her.

For the 2006/2007 school year, the Parent attended an IEP meeting (page 682 lines 23), on or about July 25, 2006. Eva Juliosky, a Head Teacher at the McCarten School, Ms. Winkelman and a Parent Member were present (page 683 liens 6-9). There were others participating via telephone. She provided the CSE team with a speech/occupational therapy/neurodevelopmental evaluation (page 684 lines 1).

At the conclusion of the meeting, the Parent stated that she was given a "draft IEP" which included a recommended school and SEIT for ten hours, as well as two sessions per week for speech and occupational therapy (page 684 lines 16-19).

The Parent stated that she did visit the recommended school and believed it to be a really good program for children who were verbal. She described the program as being an 8:1:2 setting, however, her child requires, 1:1, so that she can be elevated to a situation and attend a classroom with higher children to teacher ratio (page 685 lines 11-17). She was informed that the recommended class did not utilize ABA and that in her opinion, A█████ would be unable to learn in the recommended setting (page 685 lines 11-23). Also, there were no plans for behavioral intervention and she was told that a plan would be formulated in October "during" the school year. Consequently, the Parent reiterated that the school was not appropriate for her child at the present time.

At the McCarten School, her child communicates through her PECS book and is able to utilize her "Break Card", wherein A█████ can let the staff know that she needs a break and the staff can help her lessen resistance and frustration levels (page 688 lines 1-6).

The witness was also able to provide information as to how the behavioral plan was formulated and described how the child's self stimulatory behavior was redirected, and believed the staff utilized the "token system" to reinforce her child not to do certain

things" (pages 688 lines 24). The witness also stated that both she and the school staff are on the same page with respect to utilizing the behavioral plan. More particularly, there is a written protocol and that the therapist who works with A███ at home provided her with implementation tools.

    The Parent described the McCarten School as providing a "great program", and utilizing skilled therapists and teachers who are dedicated (page 691 lines 4-9). Also, ABA is the methodology by which her daughter has learned and it is a consistent teaching approach. She reiterated that her child is learning, as things are broken down and taught to her in small pieces, which is able to understand (page 692 lines 4-8). She described the present school year as being a good year for her child and stated that she is focusing better and enjoying learning (page 692 liens 21-22). She stated that her child was like a "sponge" and that she has clicked developmentally and understands more and is happy, learning, growing and changing (page 693 lines 21-22).

    With respect to the home program, the Parent stated that CARD is providing an "amazing" program. She receives training two hours per week from a teacher and works on learning, toileting and communication. She described the program as being functional for the home and that she is taught about skills in the child's natural environment (page 696 lines 4). She also has noted progress at home wherein the child is trying to talk more often and described her actions as "less rigid" (page 696 lines 24).

    Upon further questioning of the witness, she stated the CARD agency did not begin servicing her child until April of 2007, as she was informed at or about the end of January 2007, that the prior agency could not provide the required number of hours for her child's needs (page 698 lines 1-7), and that A███ did not get services from the end of January to the beginning of April 2007 (page 702 lines 11).

    The Parent further stated that approximately one week after the CSE, meeting in July 2006, she did receive an IEP in the mail which contained additional goals and objectives. She also received a final notice of recommendation (page 705 lines 13) which she believed to be at or about the beginning of August 2006. In response to same, she wrote a letter expressing her concerns regarding the program, however cooperated and

visited other schools. She was also told that there were no 1:1 services and or instruction at PS 226. Lastly, if her child only had a school program with no home components, she would learn less and regress.

Upon cross examination of this witness, she stated that A███ had attended the McCarten School for two years. She also had recollection that at the IEP meeting, that both she and A███s teacher assisted in preparing her goals (page 715 lines 13). The witness also stated that during the 2005/2006 school year, she did not receive services through the Department, however, paid for her own outside services (page 718 lines 12).

The parent stated that her child has learned through ABA and that this methodology is successful in terms of reinforcing and keeping her on task. Upon further questioning of the witness, she stated that the SEIT instructors that were provided by Tri State Learning, were really not running the programs appropriately, and the program was not supervised. She expressed her concerns; however, nothing was ever done in response to her inquiry (page 720 lines 20-23).

Lastly, upon questioning by the undersigned, she stated that during the period of time that her child was not provided with a SEIT from January 2007 through April 2007, that she was still providing the child with ten hours of services through her own private sources. She noticed that it was difficult for her child to return back to school after a weekend, as she had no structure at home and that her child also experienced increased levels of tantruming. A███ also regressed in terms of expressive language as there were not many people stimulating her at home. From mid April 2007, up until the present time, she has noticed improvement. The witness also stated that from January through April 2007, she paid $30.00 per hour for ten hours a week of services at home from the Gillan Brewer Facility.

The witness testified that she entered into a deferred payment plan, with McCarten and that details will be provided along with the enrollment contract in a post hearing submission. She paid $4,000.00 to the school and the balance would be due, either through financial aide or via payment from the Department depending upon the results of the instant hearing.

Upon redirect examination, the witness stated that CARD began supplying 20 hours of services and that she paid the additional ten hours of service at the rate of $60.00 per hour.

THE DEPARTMENT'S CASE

Nicole Berger testified after being duly sworn that she has been employed by the Department of Education for 17 years and is currently the lead teacher at PS 226, at 12th Street, New York City, New York and possesses a Masters Degree in Special Education.

The witness stated that the PS 226 facility at 12th Street is comprised of three preschool classrooms, each containing eight children, one teacher and two paraprofessionals, and two kindergarten classrooms which have six children in a class with one teacher and one paraprofessional (page 558 lines 18-24).

Ms. Berger described the characteristics of an autistic child, as one that has an impairment and or delay in their social abilities, communicative abilities, imaginative/symbolic play activity abilities and or cognitive disabilities. Also, that distractibility and sensory integration issues are characteristics of autism.

Ms. Berger stated that her responsibilities as a Lead Teacher are to mentor and to be a liaison for the teachers and the administration (page 559 lines 20-22). She works with the staff on solving specific issues regarding the children and in curriculum development. She also stated there was a full time speech/language therapist, full time occupational therapist and a part time physical therapist. The program follows the New York State Educational Curriculum Standards for kindergarten and pre school curriculum. Also, if children are not performing at the expected level, appropriate activities could be planned and or adapted to meet the needs of the child (page 561 lines 19/20).

Upon further questioning of the witness, she stated that all of the children in the kindergarten program have an educational diagnosis of "autism", and the preschool students have a diagnosis of a "preschooler with a disability". The majority of the children have communicative/social/cognitive/behavioral issues (page 562 lines 10-14).

The witness had recollection of a telephone call and meeting with the Parent in the instant case, and stated that pursuant to the IEP, the child was offered placement in a class with a ratio of 8:1:2 and in all likelihood would have been placed in Ms. Ciricili's classroom. She further testified that when children enter into the program, a "Brigance Early Inventory" assessment is performed, to figure out "where the children are" and "what their specific needs are" (page 564 lines 11). The Brigance Assessment testing goes on for approximately one month, generally in October which includes teacher observations and assessments. In November, the parents come in for an IEP meeting and or teacher conference and goals are discussed (page 565 lines 3).

Ms. Burger testified that the program does not adhere to any one curriculum, however many different curriculums are incorporated in to the program including TEACCH. Each child has their own individual communication system and some of the children were using the PECS program (page 566 lines 16). Visual support, photos and or Mayer Johnson pictures are also utilized throughout the day. (page 566 lines 22).

With reference to the particular class that would have been recommended for A■, there were a wide range of behaviors (page 567 lines 19), including high levels of distractibility, severe communication needs, self stimulatory behavior, difficulty in transitions, some being self injurious , low frustration tolerance, difficulty in toileting and cognitive impairment (page 568 lines 8-1 6). The witness also described difficult children who through the program, displayed significant improvement (page 570 lines 1). There is a behavior paraprofessional in the classroom working with the teacher and herself as all attending team meetings and being properly trained.

The witness also described how a behavior plan is formulated, including the data collection methodology and observations (page 572 lines 1-18). She also commented that she has attended team meetings and observed children with functional behavior assessments which follow them from classroom to classroom.

Ms. Berger reviewed A■s IEP, and that although the child has been described as requiring consistency, predictability, routine, positive reinforcement, visual cues and teacher prompts, her needs could be met in her school program (page 576 lines 2). She

Hearing Officer's Findings of Fact and Decision                                    35
Case No. 107227

also was confident that the school staff could provide related services and are trained in the PECS system. Also, there are children that could serve as good role models (page 577 lines 16).

The classroom setting permits instruction by 1:1 teaching, group instruction and small group instruction, so that the children get information in a variety of ways. The witness also described a typical day in the classroom and also stated that during meals, music, and science, the children are sitting together and working as a whole group (page 581 lines 13-15). They also sit together during music time, science and art.

There is formal staff training throughout the year, provided by the Department wherein various topics including curriculum development, age and developmentally appropriate practices, assessments, transitions, task analysis, behavior plans and professional development (page 584 lines 1-5).

Ms. Berger stated that the holistic approach that is utilized in the classroom , incorporates the best practices of various techniques that are widely accepted and used for children with autism. There is no one technique that is used for all children, but rather the best practices from various techniques are applied and individually administered (page 584 lines 15-23). The witness described ABA as a technique wherein skills are broken into small steps and that each step of the skill is taught, providing repetition to master that skill using positive reinforcement (page 585 lines 4-10). She also stated that the schools program uses positive reinforcements in a sense that a child might obtain a reward for finishing work, by using a favorite toy or a computer. There are also formal and informal opportunities for parents to be involved. More particularly, twice a year there are Parent teacher conferences, also parent association meetings on site, school leadership team meetings which occurs on a bimonthly basis. There are also communication note books in the child's backpacks which are used regularly and the parents are invited to write and expect a response, or if they prefer, a telephone conversation (page 587 lines 11-20). Parents would also be accommodated in daily communications if required.          Ms. Berger also stated there are opportunities with outside organizations such as the young

adult institute, wherein that organization makes a presentation to the parents (page 590 lines 2-6).

The witness again reiterated that a functional behavior assessment is prepared by the teacher when a child enters the classroom, (page 591 lines 19) the data is obtained through observation during the course of the day, reviewing the child's work, gathering information from the parent (page 591 lines 22-25).

Upon cross examination of the witness she stated that she and her staff are trained through District 75 to prepare a functional behavior assessment (page 593 lines 22). The Department utilizes the Mark Duran, PhD. Motivational Assessment Scale to prepare the FBA (page 594 lines 20). After the data is obtained, the teacher will note the frequency of the behavior and the duration and whether or not it is diminishing and or the course of action is appropriate (page 598 lines 3-5). Also, District 75 provided ABA training which was presented by the PS 226 Coach, Tyra Beldengreen. Also, the witness stated that neither she nor the teachers are PECS Certified, however were trained and understand how to use it (page 601 lines 24).

With respect to the TEACCH philosophy, the school adheres to the use of schedules and a very structured program to try to promote independence in each student (page 603 lines 6). The environment is modified to accommodate children with Autism, as visuals are displayed throughout the classroom to help support teaching.

Ms. Berger stated that there are children who have aggressive behaviors and that both she and her staff were trained in methodology to diminish and or extinguish the behavior (page 606 lines 5). This training was also provided through professional development services provided by the Department (page 606 lines 23-25).

Upon redirect examination, Ms. Berger stated that generalization of skills is an appropriate component of the schools behavior program to assist the child in how to generalize into other environments (page 608 lines 13). She also described opportunities for socialization including trips into the community, informal inclusionary programs, playground activities, inter class parties and special events (page 609 lines 3-9).

The next witness to testify was Brigida Ciricili, who stated after being duly sworn, that she has been employed by the Department for the past five years as a classroom teacher, and currently works at PS 226 at the 12th Street location. Prior to that, she was a crisis paraprofessional for kindergarten and first grade classes. She possesses a Masters Degree from NYU in Special Education and also has a Certificate from Pace University where she completed the TARAP Program which is a teaching/research study program for autism.

The witness currently stated that she works with a Pre K class, who are classified as "preschoolers with disabilities". She described an autistic child as one who has a delay or impairment in social interaction, communication and in play as part of the social issue with a high distractibility level (page 613 lines 12-16).

The witness described her class as having eight students, with three paraprofessionals and throughout the course of the year, two student teachers. Typical behaviors displayed in her classroom are as mild as high distractibility and as severe as self injurious behavior (page 614 lines 21-25). The children also have severe delays in communication and some exhibiting verbal and or non verbal skills. Generally, gross motor skills were on par, however fine motor skills are in need of improvement (page 615 lines 18-22).

Ms. Cirilli stated that when a child first enters the class in September, a decision is made about what type of plan the child will follow, both educationally and behaviorally. The educational piece is completed through observation as well as a review of all reports and goals as to the IEP. A team meeting follows with the related service providers and finally the Bragance Evaluation is administered. She described the teaching methodologies as being a combination of TEACCH which utilizes best practices from the New York State Developmental Standards (page 623 lines 9-11). Team meetings are held once a week which include her and paraprofessionals, as well as other meetings involving the lead teacher, and related service providers, as needed.

Ms. Cirilli stated that sensory intergration is addressed through programs implemented by the two occupational therapists, and same is presented through the

Hearing Officer's Findings of Fact and Decision                                38
Case No. 107227

"sensory diet" which assists in reducing or eliminating many behaviors (page 624 lines 18-21). The sensory diet might include brushing, lotioning, pressure, brain gym and Koosh ball.

Upon further questioning of the witness, she stated that the classroom is highly structured, and that skills broken down into very small components (page 627 lines 2). There are also opportunities for socialization including meal times, snack, playground time, small group activities and transitioning (page 627 lines 20-24). She also referenced the Parent / Teacher Communication Books in order to keep the parent informed, Parent Teacher Conferences and Report Cards as devices used to link the Parent with the child's progress.

The witness stated that she did in fact have an opportunity to review A▮▮▮▮s IEP, and that in her opinion the goals as spelled out in the IEP could appropriately be addressed in her program (page 629 lines 6).

The witness described ABA as a teaching technique or method, in which skills are broken down into the smallest steps possible and that each skill is taught individually until mastered through a series of repetition and prompting (page 637 lines 19-23). Further, aspects of ABA are implemented in the schools program as there is task analysis where the skills are broken down and repetition utilized.

Upon cross examination of this witness, she believed that of the eight students in her class, four were non verbal and two children exhibited aggressive behaviors and one child was self injurious.

The last witness to testify was Erin Yurkewecz, who stated after being duly sworn, that she received her Masters Degree in Occupational Therapy in 2002 and is a New York State Occupational Therapist. She has been so employed for the past five years and has worked with children as a specialty for the past three and a half years. She worked as a contract therapist, with children at different places including a hospital and the Gillan Brewer School

Ms. Yurkewicz stated that she worked with children on the autistic spectrum for approximately three and a half years, and that she currently works with A▮▮▮▮ She first

received her referral on September 2006 from the Department and gets paid directly from the Department.

Ms. Yurkewicz provided occupational therapy sessions at the Sensory Gym at the Gillan Brewer School and sees A████ two times a week for forty five minutes. She has reviewed A████s IEP and feels that the goals and objectives as stated are reasonable (page 648 lines 24). She described A████ as having decreased sensory processing, decreased self regulatory, decreased motor planning/strength and postural control, decreased grow/fine motor skills and decreased visual perceptual skills. Her treatment techniques include sensory input and sensory opportunities for the child's overall regulation that helps to improve her body awareness and the awareness of her environment (page 649 lines 11-15). The witness stated that when she first began to work with the child, she did engage with self stimulatory behavior which interfered with her ability to attend however, she does not see that as regularly as she did before (page 651 lines 5). She also utilizes animation including floor time and gestures such as a "high five". (page 652 lines 9).

Ms.Yurkowitcz stated that she communicates with A████s teachers, via email as needed and also communicates with the occupational therapist that she works with at school (page 652 lines 25). The witness has observed the child at school and she objects to occupational therapy being performed in the Gym as opposed to the classroom.


FINDINGS OF FACT AND CONCLUSIONS

Parents seek reimbursement for the cost of A████s tuition at the McCarton School's 2006-2007 program, as well as for ten hours per week, (in addition to the 10 hours already provided by the NYCDOE, which the Parents have accepted on a "without prejudice" basis, ABA 1:1 extended day and weekend services/ABA supervision and compensatory relief for 80 hours. The Department submits that the parent's claim for tuition reimbursement for the McCarton School (2006/2007 school year), in addition to 10 hours of extended day ABA therapy, speech/language therapy 2 x 45 x 1, occupational

therapy 1 x 45 x 1 and physical therapy 1 x 60 x 1, be denied in its entirety. They maintain that they have offered A█████a FAPE, in that the recommendations for an 8:1:2 program at the P226 with occupational therapy 3 x 30 x 1, speech/language therapy 3 x 30 x 1, a full time individual management paraprofessional; and home services that include SEIT (ABA) 10 hrs., occupational therapy 2 x 45 x 1 and speech/language therapy 2 x 45 x 1, is reasonably calculated to provide A█████with educational benefits in the least restrictive environment.

In evaluating whether a student was offered FAPE, the IHO must consider whether the parent has met the requirements under Schaffer V. Weast, 546 U.S. 49, 126 S. Ct. 528 (2005) which dictates that the parent assumes the burden of persuasion in an IDEA case when she is the moving party. Schaffer explicitly provides that "the burden of persuasion in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." Schaffer, at 537. As such, it is the parent's burden to prove that the DOE failed to offer FAPE, that their chosen program is sufficient, and that the equities favor a decision in their favor. It is the position of the Department that the parent has not met their burden under Schaffer V. Weast in proving that the DOE did not offer FAPE. The Department maintains that the IEP recommendations for A█████that resulted from the July 25, 2006 Annual Review meeting was based upon progress reports submitted by the McCarton School and that it made sense that the documentation from the school served as the basis for reporting A█████s functioning levels and developing IEP goals as McCarton had been A█████s educational setting for ten months prior to the meetings.

Further, the Department argues that the team was duly constituted, consisting of a parent, teacher, and speech therapist from McCarton, in addition to the District Representative and parent member. The Department also maintained that concerns articulated by the parent and teachers were very much taken into consideration by the team in developing a program recommendation. Also, that it was expressed at the meeting and clear from the documentation that in addition to being non verbal, A█████ was highly distractible and had significant delays in cognition, motor skills and social/emotional development and engaged in self stimulatory behaviors which interfered

with learning and that there was a need for A███ to have consistent 1:1 support in the classroom setting. The Department stated that although P226 was not an ABA program, they did recommend ten hours of ABA SEITT services after school and despite the parent requesting 20 hours of ABA, the Department was of the position that ten hours was an adequate amount to assist in reinforcing skills and provide parent training.

Department's counsel states that it can not be disputed that A███ made progress during the 2005/2006 school year.

Further, the Department is of the position that even with eight students in the class, programming is highly individualized and that teaching consists of direct and small group instruction. As Ms. Berger testified, even during small group instruction, students' individualized needs are incorporated into every aspect of the lesson and as per Mr. Cirilli's testimony, every lesson id differentiated in order to address the needs of each child. (Tr. 663;21-23)

The Department stated that P226 provides an array of full related services, including speech and language therapy, occupational therapy as well as part-time physical therapy and can be implemented by "push in" or a "pull out" service. P226 offers a wide range of equipment in a sensory gym and Ms. Cirilli stated that the occupational therapist on staff collaborates with the classroom teacher to develop a "sensory diet" for students to address interfering sensory seeking behaviors within the classroom setting. Also, at P226 the PECS system is available, and utilized by several students and the staff receives training on its use by the school's speech therapists.

The Department maintains that they are not disputing that A███ engages in significant behaviors that interfere with learning and they are in agreement that A███ requires constant individual attention. For that very reason, an individual management paraprofessional was recommended to help support A███ throughout the school day.

In addition, in A███s case, the Department stated that a functional behavior assessment (FBA) would be conducted in the beginning of the school year. This assessment would include data collection targeting specific behaviors and developing a

Hearing Officer's Findings of Fact and Decision                                    42
Case No. 107227

behavior plan and motivational assessment would be incorporated into this process as a means to understanding why specific behaviors occur.

The Department also argued that both the Parent and the McCarton School staff maintain that A█████ requires a 1:1 staffing ratio to learn, however, she has never attended an educational program with more than two other students. Further in a larger setting, there would be more opportunity built into the day to desensitize her to the distractions brought about by more students. At P226, there is a focus on peer interaction and socialization, which are critical areas of development for a student approaching kindergarten age. Meaningful opportunities for peer interaction would be provided in the classroom setting, on a daily basis throughout the instructional day. A█████ would have the opportunity to benefit from exposure to students who are more verbal and higher functioning.

The Department also stated that the July 25, 2006 IEP was valid as the goals and objectives were developed in conjunction with the teacher and speech therapist from McCarton School, which happens to be an ABA program, and disagrees with the Parent, that for that very reason, an ABA setting should have been recommended.   The Department disagrees and relies on the testimony by Ms. Cheddie, P226 principal, who stated that the pre academic goals were typical of the goals being worked on at P226. (page 339, 23-24). Ms. Berger, the Lead Teacher and Ms. Cirilli, Classroom Teacher agreed that the program could address the goals and objectives and that the IEP does not indicate that the goals and objectives have to be implemented using ABA methodology.

As to the allegations that there was no general education teacher present at the IEP meeting, and that the presence of a general education teacher is required "only" if the child is or may be participating in the regular education environment. Due to the severity of A████s needs, the Department maintains that at no point was a general education program considered.

Additionally, the Department addresses Parents' counsel's claim that the IEP included goals using the "PECS" system; however, Assistive Technology (AT) was not checked

off on the IEP. In response, the Department stated that as per testimony, there was no evaluation/recommendation submitted at 7/25/07 meeting, in order for AT to be checked "off" on the IEP, and that it was appropriate to include it in related goals, as PECS system is a communication system that is utilized by non verbal students and is available at P226.

With respect to allegations that the Behavior Intervention Plan (BIP) was vague and ambiguous, the Department points out that the teacher from the McCarton School assisted in developing the BIP at the time of the IEP conference. Further, that upon entering P226, every student recommended for a 1:1 Para would have a FBA in order to develop a comprehensive behavior intervention plan.

The Department is also of the position that the Parent failed to demonstrate appropriateness of the program for which they are seeking reimbursement. More particularly, the Department stated that A█████'s education is currently taking place in a highly restrictive, tightly controlled teacher directed environment, and that A█████'s head teacher at the McCarton School is not a certified special education teacher. Also, there is only one other student in the class and he is also non verbal, and that opportunities for interactions with peers are limited to lunch period, OT sessions in the gym, walking in the corridor, neighborhood walks and a one session weekly paired with another child to work on play skills. These "small opportunities" (page 1203, line 17) as referred to by Ms. Hickey, from the McCarton School, for peer interaction are widely spread apart.

The Department's counsel also stated that their recommendation of ten hours of SEIT services as well as speech/language and occupational therapy as a home program is sufficient and that the Parent's request for an additional ten hours of SEIT is excessive. Also, the Department states the Parent's testimony that there was significant regression during the period of time when A█████ was receiving only ten hours of home ABA as opposed to 20 hours, is an indication that the school program is not effectively working for A█████ and if the program was appropriate as the parents maintain, there should be more evidence of the generalization of skills from school to home.

Lastly, the Department maintains that equitable principles do not support the Parents claim, as there was a predetermination on the part of the Parent to enroll A█████

at the McCarton School for the 2006/2007 school year and that the Parents were only interested in a 1:1 setting for A███████

       In a tuition reimbursement case, the fact finder looks to: 1) whether the IEP (placement and program) proposed by the school district was procedurally and substantively appropriate (Prong I) and (2) whether the services provided by the Parents were "appropriate" under the IDEA (Prong (II). Sch. Comm. of <u>Burlington V. Department of Education of Massachusetts</u>, 471 U.S. 359, 369-270, 105 S. Ct. 1996, 2002-2003 (1985); <u>Florncey County School District Four V. Carter</u>, 510, U.S. 7, 12-14, 114 S. Ct. 361, 364-366 (1993); <u>Frank G. V. Board of Education of Hyde Park</u>, 459 F. 3d 356 (2d. Circ. 2006). The Parents' Prong II burden is less stringent and more relaxed than the Prong I standard to which a School District must adhere in offering a child a Free and Appropriate Public Education (FAPE). That said, Parents are not barred from reimbursement where a private school they choose does not meet the level of IDEA's definition of FAPE. See Frank G., 459 F 3d at 364 (citing <u>Florence County School District Four V. Carter</u>, 510 U.S. 7,14, 114 S. Ct. 361) In fact, the Second Circuit has expressly embraced the concept that the appropriateness of an unilateral educational placement should be subject to a more relaxed standard. The Frank G. Court expressly held that the unilateral placement need not be perfect, need not meet all of the child's special education needs, and need not even be in the child's least restrictive environment. Furthermore, the unilateral placement need not offer the child an IEP or employ certified special education teachers. In essence, "the test for the Parent's private placement is that it is appropriate, and not that it is perfect." Id. (referencing <u>M.S. ex rel. S.S, V. Bd. Of Educ.</u> 231 F. 3d (2d Cir. 2000), in turn quoting <u>Warren G. V. Cumberland County School District</u>, 190 F. 3d 80, 84 (3d Cir. 1999))

       In A█████s case, I concur with the Parent that the Department failed to offer A█████ a FAPE, committing both "procedural and substantive errors". More particularly, with reference to Prong I: The Department failed to Proved A█████ with a FAPE and committed a number of procedural and substantive violations in developing A█████s IEP. A█████s Parents were not afforded the opportunity to participate as equal members

of the IEP team during every step of IEP development and the IEP developed at the July 25, 2006 meeting was not the same IEP that A████s Parents received in the mail approximately one week later. Additional Goals and Objectives that were apparently developed after the meeting were included in the IEP sent to A████s parents (page 705) (Exhibit P-D and D-7). The only Goals and Objectives that were provided for were occupational and physical therapy (Exhibit P-D) and given A████s severe deficits and needs, the IEP provided to her parents was not tailored to enable her to making any meaningful gains.

Also, the Department's proposed placement and program was not appropriate for her. Ms. Eva Szulyovszky, A████s classroom teacher at the McCarton School, testified that every person present at A████s 2006/2007 IEP meeting except the one Department's Representative (who had neither met nor observed A████ recommended a 1:1 ABA school placement for A████ with extended day ABA services (page 237) other alternative methods of instruction, such as TEACCH and Greeenspan, which do not have a behavioral component and would be inappropriate for A████. Jacqueline Hickey, BCBS the Associate Director of the McCarton School stated that the 8:1:2 ratio recommended by the Department was inappropriate for A████s individual needs. Even a 6:1:1 setting is inappropriate for A████ as she "is a child that requires each learning situation to be highly structured, to be broken down into the smallest components, and taught purely," Ms. Hickey stated that A████ would not be able to make any educational or behavioral gains in either an 8:1:2 or a 6:1:1 setting. Ms. Kahn testified that A████ would need an increased attention span in order to be taught in an 8:1:2 class setting and that adding a teacher in an 8:1:2 setting would not give A████ the level of intensity and 1:1 support that she needs to learn (page 155-156).

Dr. Agin testified: "in higher ratio of student to teacher, it would just be a waste of time" and that providing A████ with a 1:1 paraprofessional in an 8:1:2 setting is not the answer to this problem. Ms Kahn testified, "the problem [is]…the paras don't have any ABA training, and so it is more just a body sitting there, pointing to the child…you need somebody there who knows when A████ is not learning something, and how to

modify it so that she will learn it and I just don't think the paraprofessionals would have that skill set." (page 156) Ms. Maritza Gonzales, a paraprofessional at PS 226 (the school that the Department recommended for A████), testified that she could not recall what specific training she had in working with children on the autism spectrum, or even the last time she actually went to any trainings (page 536). Ms Gonzalez testified that she does not have much training in TEACCH, and that she has no training in ABA. (page 539).

Ms. Hickey testified that most of the information in A████s July 25, 2006 IEP was provided by the staff of the McCarton School and that the Department's proposed IEP for A████notes that "she utilizes a picture exchange system" and such a system is an assistive technology device. However, in the same IEP, the Department indicates that no assistive technology device was necessary for A████ (page 93/94 Exhibit P-C).

The McCarton School staff provided the Department with Goals and Objectives for A████ however they were developed for implementation in a 1:1 ABA setting, and should not be implemented in the Department's recommended 8:1:2 setting.

I concur with the Parent's counsel, in that contrary to the recommendations of one of A████s speech and language therapists, Sara Daum, the Department's representative recommended three 30 minute sessions of 1:1 speech and language therapy in school and two 45 minute sessions of speech and language outside of school. Ms. Daum testified that for A████, thirty minute sessions are "too short" and does not allow enough time to really address the goals and then transition A████ out to start another therapy session. It's just not enough time." (Page 337/328).

Also, contrary to the recommendation of one of A████s occupational therapist, Leslie Weinberg, the Department recommended three 30 minute sessions per week and two 45 minute sessions per week of occupational therapy for A████. Ms. Weinberg testified: "if occupational therapy sessions are any shorter than 45 minutes, by the time A████was focused and ready, it would leave basically ten minutes to work on her Goals and Objectives ." (Page 42-43). I concur with this statement.

With regards to extended day programming, the Department representative only recommended 10 hours per week of ABA services outside of school, rather than the 20

Hearing Officer's Findings of Fact and Decision                                    47
Case No. 107227

hours per week recommended by all of A█████s service providers. Ms. Szulyovsky testified: "A█████needs as many hours of therapy at home as possible because she cannot function…appropriately if she is left to her own devices. She needs to generalize the skills that she learned at school." (page 238). Dr. Agin testified: "Ten is not enough, and that this is so important, that we not only think about Monday through Friday, but weekends as well."

Further testimony indicated that Ms. Kahn visited the proposed placement at PS 226 and spoke with the classroom head teacher, Nicole Berger. Ms. Berger explained that the proposed class at PS 226 was not an ABA program and that the curriculum was based upon thematic units, as in a typical mainstream preschool setting. She opined that the recommended program would be over A█████s head and that A█████would not be able to acquire new skills in such a setting (page 158).

The Speech therapist at PS 226 , Clair Higgins, is not PROMPT certified and the staff is not "PECS" certified and has received limited training with regards to TEACCH and ABA. Also, PS 226 does not provide individual parent training and counseling. Instead, the school has two parent association meetings per year to have general discussions about problems that parents may encounter (page 431-432, 599-601).

The McCarten School is a 1:1 intensive educational program based on the principles of ABA that is dedicated to the education of children on the autistic spectrum. During 2006/2007, twenty two students attended the McCarton School and programs include, daily speech/language therapy and occupational therapy. Data collection is an essential part of the McCarton's School's ABA program, and data are taken and evaluated on a daily basis (page 50-51). A full ABLLS (Assessment of Basic Language and Learning Skills) is done for each student from which a specific individualized education plan is developed for each child based on the student's unique deficits and strengths. (page 53).

The school's entire staff conferred weekly, and within A█████s classroom the staff meeting on a daily basis (page 81, 211,30). A█████s McCarton School IEP was developed through collaboration of all of A█████s teachers and therapists (page 82).

Hearing Officer's Findings of Fact and Decision                                    48
Case No. 107227

For the 2006/2007 school year, A███ was in a classroom with one other child and three teachers (one teacher for each child and the lead teacher) and received services from a speech/language pathologist and an occupational therapist. Ms. Hickey and the other staff at the McCarton School found that A███s level of distractibility required that she be placed in such a small classroom and that decreasing the number of students in A███s class (from three to two) has significantly increased her acquisition of skills. (page 78).

A███s parents were active participants in their daughter's programming at the McCarton School and had the opportunity to observe and work with A███ and her teachers in the classroom on a daily basis. Ms. Szulyovszky provided the M███s with intensive parent training at no additional cost.

A███s progress was tracked through data collection and goal sheets. In addition to her related services therapist, Rebecca Harrington, one of A███s teachers was mainly responsible for data collection (Tr. 80). A███ made considerable progress since the beginning of the school year and her interfering behaviors have significantly decreased.

The PECS system has proven highly successful for A███, who has made great progress in her communication skills. Ms. Kahn testified that during her evaluation of A███ in April 2006, the PECS system was "the best form of communication that I saw for A███ exhibit." (Tr. 146). A███s fine and gross motor skills improved and she is beginning to integrate peers into her interactions.

A███ made meaningful educational progress at the McCarton School during the 2006/2007 school year (including the summer of 2007) and the school placement is a component of an appropriate educational placement for A███ (Tr. 119-120, 171,295,668). Each of A███s service providers and evaluations strongly recommend a 1:1 ABA educational setting.

Seven hours per week of speech and language therapy (five hours provided in school, two provided outside of school) was recommended for A███ because this was described as her greatest deficit. Dr. Agin recommended PROMPT therapy specifically,

because aprazia is a neurological disorder, so "children with apraxia don't learn just by looking and listening like others who have speech delays." If A███was provided with speech and language services by a provider not trained in PROMPT therapy, she would not move forward in her verbal speech skills (page 298, 328-329). At least six hours per week of occupational therapy was strongly recommended for A███as without constant instruction, A███simply does not maintain her skills (page 297).

The Parent stated that the Department contends that the McCarton School setting was too restrictive for A███because of a lack of sufficient socialization opportunities, however, A███had multiple opportunities to socialize with other children throughout the day, including during gym periods, in the lunchroom and on community outings (page 77 lines 127). I agree that an extended day home and community based program is essential for A███

A███received extended 1:1 ABA services through the Center for Autism and Related Disorders (CARD) a New York City "approved" provider. Deirdre King, supervised and provided direct ABA/SEIT services for A███s home based ABA program. Ms. King started working with A███in April 2007 when A███s mother, contacted CARD for ABA services, as the services were note being fully provided for by Tri State Learning Center. (page 658-659) CARD provided 20 hours per week of home and community based ABA services to A███, 10 of these hours were funded through A███s IEP and 10 were privately funded by the M███ (at the rate of $60 per hours). Ten hours of ABA were provided during the week, Monday through Friday, with the remaining ten hours provided on the weekends.    Included as part of the McCarton School program, home to school coordination plays an essential role in A███s development (page 83). A███s school program was coordinated on a weekly basis with her home program. Data on A███s progress was taken continuously and communication was open and constant between the home based and school based programs. CARD held weekly staff meetings as well as bi-weekly meetings )which Ms. Szulyovsky and A███s Parents attended in the M███ home (page 662). Additionally, daily communication via email and person to person contact between A███s parents

and all of A███s teachers and therapists continued throughout the year (Tr. 666). Ms.
Szulyovsky, served as the home to school coordinator who worked with A███s parents
and the home and community based ABA staff at least two hours per week training them
to implement A███s academic and behavioral programs at home and in the
community. A███s home and community based therapists had the opportunity to come
to the McCarton School for training and to work in the classroom with Ms. Szulyovsky
and A███. Socialization skills were continued in A███s home program through
interaction with typically developing peers in the neighborhood and with family
members. In addition to her home and community based ABA, A███received two 45
minute sessions per week of home based occupational therapy through her IEP from Erin
Yurkewicz.

     All of A███s therapists strongly recommend that she receive at least 20 hours
per week of ABA outside of school (Tr. 84, 92, 171) and Dr. Agin testified "her dual
program at school and at home generalizes the skills that she learns in school to the home
and natural environment settings. Also, if A███ did not have weekend hours, in
addition to the after school ABA program, she would not generalize the skills that she
learns at school and the unbalance of unstructured home time and structured school time
would lead to regression of skills even in the school setting. When A███has a break in
services, there is a significant regression and an increase in maladaptive and inappropriate
behaviors and it typically takes at least one week to reacquire target skills that A███had
previously met.

     In addition to the home and community based ABA, two hours per week each of
home based speech and language therapy and occupational therapy were recommended.
This intensity level was required to maintain consistency and increase generalization of
A███s skills. A███ "requires this intensity of services just in order to continue
making he progress she's made in order to avoid regression." (Tr. 34).

Hearing Officer's Findings of Fact and Decision                                        51
Case No. 107227

After careful consideration and for all the above reasons, I find that the Parent has established compliance with Prong II of the Burlington test, more particularly that the school and program selected were appropriate for the child.

Once the Court has made a determination in favor of the Parents on the first two Prongs, it may then determine whether equitable circumstances support the Parent's claims, pursuant to Prong III and order "appropriate" relief. See <u>Still V. DeBuono</u>, 101 F. 3d 888, 891 (2d Cir. 1996) ("appropriate" relief includes "the authority to order reimbursement for expenditures made to obtain appropriate educational services").

There are no equitable considerations that would serve to preclude any reimbursement award herein. The cost of the McCarton School program are reasonable. A▅▅s parents have paid $4,00.00 toward the tuition and are responsible for the remaining amount pending the outcome of this case. The McCarton School program is a 1:1 ABA school which incorporates five 45 minutes sessions per week of occupational therapy, five 60 minute sessions per week of speech and language therapy, parent training and counseling and home to school coordination.

The Department does not offer credible evidence regarding non compliance on the part of A▅▅s parents. A▅▅s parents were cooperative and provided the Department with all of A▅▅s evaluations and progress reports prior to the July 25, 2006 IEP meeting. A▅▅s parents visited the school proposed by the Department and after the visit, wrote a letter to the NYCDOE representative listing their concerns and offering to see any other school.

Lastly, petitioners seek an award of compensatory education for 80 hours of 1:1 ABA services and supervision outside of school, ten hours per week of 1:1 home based ABA were mandated by A▅▅s CPSE IEP and were not being provided by the Department from January 31, 2007 through April 11, 2007. The Tri State Learning Center therapists did not show up on a consistent basis and provide the full recommended services.

I agree that Compensatory relief is appropriate in this case.

    A███ and her Parents seek compensatory education in the form of 80 hours of 1:1 ABA services with supervision, relating to the eight week time period between January 30, 2007 and April 11, 2007 when A███ was not receiving even the ten hours of home based 1:1 ABA (SEIT) services mandated on her IEP. "A school district may be obligated to provide a student with compensatory education if the child has been excluded from school or denied appropriate services for an extended period of time". ) <u>Application of a Child with Disabilities</u>, Appeal No. 00-086 (citing Burr V. Ambach, 863 F. 2d. 1071 (2d Cir. 1988), Mrs. C. B. Whaton, 916 F. 2d 69 (2d Circ 1980), Leter H. V. Gill, 916 F. 2d 865 (3d Cir. 1990), and Miner V. Missouri, 800 F 2d 749 (8th Cir. 1986) The local educational agency must commit a "gross violation" of a student's right to receive a FAPE in order for the fact finder to award compensatory education. See Burr V. Ambach, 863 F 2d T071 (2d Cir. 1988)  although compensatory education is typically awarded to the children who are no longer eligible to attend school because of age or graduation,  a State Review Officer noted that "equitable considerations compel the conclusion that there should be a remedy for the failure to provide services." See Application of a Child with a Disability Appeal No. 92-40 (citing Application of a Child with a Handicapping Condition Appeal No. 91-12).

<u>ORDER</u>

    The Parents demand for relief is granted as follows:

    1.    The Department shall reimburse the Parents for the tuition and costs related to the McCarton School's 2006/2007 program in the sum of $84,000.00 within 30 days from the date of this order.

    2.    the Department shall reimburse the Parents for 10 hours per week of additional ABA services 1:1 extended day and weekend services, plus ABA supervision for the 2006/2007 school year in the sum of  $16,545.00 within 30 days from the date of this order.

Hearing Officer's Findings of Fact and Decision                                    53
Case No. 107227

3.    the Department shall pay for costs for 80 hours of home and community based 1:1 ABA services with supervision within 30 days of receipt of invoices.

Dated:  October 26, 2007

*Gary D. Peters*

GARY D. PETERS, ESQ.
Impartial Hearing Officer

GDP:ds

**PLEASE TAKE NOTICE**

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed.  The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed.  If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b])  Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision.  Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

Hearing Officer's Findings of Fact and Decision                    54
Case No. 107227

## DOCUMENTATION ENTERED INTO RECORD

**EXHIBITS**

| No. | Date | Description | #pages |
|-----|------|-------------|--------|

**PARENTS**

| No. | Date | Description | #pages |
|-----|------|-------------|--------|
| A | 10/03/06 | Demand for Due Process and Pendency | 4 |
| B | 08/18/05 | NYC Early Intervention IFSP | 17 |
| C | 07/25/06 | NYC Board of Education IEP | 23 |
| D | 07/25/06 | NYC Board of Education IEP | 12 |
| E | 09/27/06 | McCarton School IEP | 13 |
| F | 12/20/06 | Speech/language Progress Report By the McCarton Center | 3 |
| G | 12/18/06 | Educational Progress Report By McCarton School by Eva Szulyovsky B.A | 5 |
| H | 12/11/06 | Occupational Therapy Report McCarton School by Leslie Catapano, MA, OTR/L Bari Toor, OTR/L | 4 |
| I | 09/2006 | Behavior Reduction Plan McCarton School report by Cecilia McCarton, MD Rebecca Arneson, Ivy Feldman, PhD, & Jacquelin Hickey, BCBA | 2 |
| J | 08/04/06 | Letter to Peggy Winkleman from M███ M███ | 2 |
| K | 07/17/06 | Letter to Peggy Winkleman from M███ M███ | 2 |
| L | 07/14/06 | Speech/language Progress Report By McCarton School Report by Jill Cochrane, MA | 3 |
| M | 07/14/06 | McCarton School Enrollment Contract | 3 |
| N | 06/26/06 | Letter to Peggy Winkleman from M███ M███ | 2 |

Hearing Officer's Findings of Fact and Decision                                55
Case No. 107227

| O | 06/23/06 | Educational Progress Report<br>By McCarton School report by Carolyn Chiu, BA | 4 |
| P | 05/31/06 | Occupational Therapy Report/ McCarton School<br>Report by Tracey Fisher, MA | 7 |
| Q | 05/17/06 | Neurodevelopmental Evaluation | 7 |
| R | 04/17/06 | Classroom Observation Report by Sara Kahn MA | 4 |
| S | | Tuition Contract | 7 |
| T | | Tuition ledger, brochures, office deposit and checks | 18 |
| U | | Tuition Ledger Checks | 18 |

**Department of Education**

| 1 | 06/23/06 | McCarton School Educational Progress Report | 4 |
| 2 | 03/15/06 | McCarton School Educational Progress Report<br>Home Therapy Program | 4 |
| 3 | 07/14/06 | McCarton Speech an language Progress Report | 3 |
| 4 | 03/18/06 | Speech/Language Progress Report/Lavinia Pereira | 3 |
| 5 | 03/13/06 | OT Progress Report/Jennifer Pagoto | 3 |
| 6 | 05/31/06 | McCarten OT Progress Report | 17 |
| 7 | 07/25/06 | IEP | 21 |
| 8 | 07/25/06 | C7P Final Notice of Recommendation | 1 |
| 9 | 07/25/06 | AR-2P Authorization of Change of IEP | 1 |
| 10 | 08/04/06 | Letter from M██ M███to Ms. Winkleman | 1 |
| 11. | 02/06/07 | NYCDOE Quality Review Report | 10 |